**FORD MOTOR COMPANY, Petitioner**

v.

**ENVIRONMENTAL PROTECTION AGENCY, Respondent**

**Automobile Importers of America, Inc. and State of California, Intervenors.**

No. 78–1791.

United States Court of Appeals District of Columbia Circuit

Argued March 26, 1979

Decided Aug. 17, 1979

Rehearing Denied Oct. 25, 1979.

John E. Nolan, Jr., Washington, D. C., with whom W. George Grandison and Charles G. Cole, Washington, D. C., and Thomas L. Saybolt, Dearborn, Mich., were on the brief, for petitioner.

James McNab, III, Atty., Environmental Protection Agency, Washington, D. C., a member of the bar of the Supreme Court of California, *pro hac vice*, by special leave of court, Bruce L. Bertelsen, Atty., Environmental Protection Agency, Washington, D. C., a member of the bar of the Supreme Court of Michigan, *pro hac vice*, by special leave of court, and David E. Dearing, Atty., Dept. of Justice, Washington, D. C., with whom Sanford Sagalkin, Acting Asst. Atty. Gen., Washington, D.C., Joan Z. Bernstein, Gen. Counsel, and Gerald K. Gleason, Atty., Environmental Protection Agency, Washington, D.C., and Angus Macbeth, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondent. James W. Moorman and Lloyd S. Guerci, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondent.

**1294**

Joel S. Moskowitz, Deputy Atty. Gen., of the State of California, Sacramento, Cal., for intervenor State of California.

Milton D. Andrews, Dennis M. Schwentker, and Lance E. Tunick, Washington, D. C., were on the brief for intervenor Automobile Importers of America, Inc.

Before WRIGHT, Chief Judge, and MacKINNON and ROBB, Circuit Judges.

Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.

Dissenting opinion filed by Circuit Judge MacKINNON.

J. SKELLY WRIGHT, Chief Judge:

Almost from its inception the federal program for regulation of motor vehicle emissions has recognized the pressing air quality problems of southern California and provided officials of that state with an opportunity to continue their pioneering efforts to grapple with them.[1] The key provision in this regard authorizes the Administrator of the Environmental Protection Agency to waive on California's behalf the section of the Clean Air Act that preempts state regu-

lation in the auto emission area.[2] After obtaining such a waiver California can enforce within its borders its own pollution standards. Until 1977, a waiver of federal preemption could only be obtained if the relevant California standards were in every respect at least as stringent as the comparable federal ones.[3] The result was that any vehicle that complied with the California standards automatically and by definition met or exceeded the applicable federal standards as well. In 1977, however, Congress determined to give California more leeway to tailor its emission control program to its particular problems.[4] As a result, the Clean Air Act was amended to expand the deference which the Administrator is required to give to California's decisions and assessments and, more particularly, to permit a waiver for California standards that are *in the aggregate* as strict or stricter than federal ones even if some particular state standards are in fact less strict.[5]

The present petition is one of several challenging the Administrator's June 7, 1978 decision waiving federal preemption for California's most recent emission standards.[6] It raises only one question: wheth-

---

1. California began regulating auto emissions in 1964, when it adopted standards applicable to 1966 model-year cars. *See generally* Comment, *Passenger Vehicle Air Pollution Control in California: Enforcement Progress and Problems*, 15 Santa Clara Lawyer 695 (1975). The provisions of the federal legislation governing motor vehicle emissions which give California special latitude were enacted in 1967. *See* 196 U.S.App.D.C. at ———, 606 F.2d at 1295 – 1296, *infra*.

2. Section 209(a) of the Clean Air Act, 42 U.S.C. § 7543(a) (Supp. I 1977) (formerly 42 U.S.C. § 1857f–6a(a) (1976)), contains the general preemption of state regulation in this area. Section 209(b), 42 U.S.C. § 7543(b) (Supp. I 1977) (formerly 42 U.S.C. § 1857f 6a(b) (1976)), is the California waiver provision. The entire Clean Air Act was revised and transferred in 1977 to 42 U.S.C. § 7401 *et seq.* (Supp. I 1977). Except where useful for clarity, we will cite only to the revised version.

3. *See* the pre-1977 version of § 209(b), 42 U.S.C. § 1857f–6a(b) (1976).

4. *See* H.R.Rep. No. 95–294, 95th Cong., 1st Sess. 301–302 (1977) (hereinafter 1977 House Report).

5. *See* the amended version of § 209(b), 42 U.S.C. § 7543(b) (Supp. I 1977). A key purpose of the amendment permitting a waiver for state standards that are in the aggregate as strict as federal ones was to allow California to require manufacturers to reduce levels of nitrogen oxides to a point that probably could not be reached for technological reasons if full compliance with the federal carbon monoxide standard were insisted upon. *See* 1977 House Report, *supra* note 4, at 301–302; 196 U.S.App. D.C. at ——— , 606 F.2d at 1296–1297, *infra*.

6. The Administrator's waiver decision is set forth at 43 Fed.Reg. 25729 (June 14, 1978), and reproduced in the Joint Appendix (JA) at 2. We refer to it henceforth as "Waiver Decision." In addition to the petition we decide upon today, two other challenges to the June 7 Waiver Decision are before this court. In one, Docket No. 78–1799, the American Motors Corporation challenges the Agency's refusal to give it greater lead time to meet the California standards for nitrogen oxides. In the other, Docket No. 78–1794, the Motor and Equipment Manufacturers Association attacks the portion of the Waiver Decision which covered an optional California certification procedure that permits

er vehicles which conform to those standards but not to the applicable federal ones may be sold outside of California. We conclude that they may not[7]—a result we believe flows both from the text of the 1977 amendments and from the policies underlying the Clean Air Act. Accordingly, the determination of the Administrator is, in pertinent respects, affirmed.

## I. BACKGROUND

### A. *Prior to 1977*

California launched its emission control program in 1964 with the adoption of standards applicable to the 1966 model year.[8] By the early 1970s it had set maximum levels for the three major types of pollutants generated by the automobile: hydrocarbons (HC), carbon monoxide (CO), and the various oxides of nitrogen ($NO_x$).[9] Congress became active in the emission control area in 1965, when it authorized the Secretary of Health, Education and Welfare to promulgate federal standards for new cars.[10] Two years later, apparently concerned that auto manufacturers might be

subjected to multiple and inconsistent requirements,[11] Congress enacted what is now Section 209(a) of the Clean Air Act.[12] That section provides:

(a) No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.[13]

Even as it approved this preemption provision, Congress recognized that "compelling and extraordinary circumstances" in California were sufficient "to justify standards on automobile emissions which may, from time to time, need to be more stringent than national standards."[14] Accordingly, it enacted the original California waiver provision—the precursor of what is

---

manufacturers to comply with less stringent standards if they can demonstrate that their vehicles will remain in compliance for 100,000 miles. Compliance with primary standards need only be demonstrated for 50,000 miles. Although these cases were consolidated for argument, they pose quite distinct issues and we accordingly decide them in separate opinions.

7. At the risk of stating the obvious, our holding is simply that California-equipped cars may not be sold in other states merely because they conform to California's standards. We do *not* hold that such cars are barred from sale in states which choose to adopt the California standards as their own pursuant to § 177 of the Clean Air Act, 42 U.S.C. § 7507 (Supp. I 1977). *See* 196 U.S.App.D.C. at ———, 606 F.2d at 1297–1298, and note 54, *infra*. Nor do we hold, for obvious reasons, that cars which meet both California and federal standards cannot be sold nationwide.

8. *See* Comment, *supra* note 1, 15 Santa Clara Lawyer at 695–699.

9. *Id.*

10. Pub. L. No. 89–272, 79 Stat. 992 (1965). Section 202 of that provision required the Secretary to prescribe "as soon as practicable standards, applicable to the emission of any

kind of substance, from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause or contribute to, or are likely to cause or to contribute to, air pollution which endangers the health or welfare of any persons * * *." Subsequently, Congress adopted its own motor vehicle emission control standards. *See* Clean Air Amendments of 1970, Pub. L. No. 91–604, 84 Stat. 1676 (1970). Those same amendments replaced all references to the Secretary with references to the EPA Administrator. *See id.* § 15(c)(2).

11. S.Rep.No.90–403, 90th Cong., 1st Sess. 32–33 (1967); H.R. Rep. No. 90–728, 90th Cong., 1st Sess. 21 (1967).

12. Section 209(a) now appears at 42 U.S.C. § 7543(a) (Supp. I 1977). It remains in substantially its original form. When enacted in 1967 it was designated § 208(a). *See* Air Quality Act of 1967, Pub. L. No. 90–148, 81 Stat. 485 (1967).

13. 42 U.S.C. § 7543(a) (Supp. I 1977).

14. H.R. Rep. No. 90–728, 90th Cong., 1st Sess. 21 (1967).

now Section 209(b) of the Clean Air Act.[15] Prior to its amendment in 1977[16] that section read:

(b) Waiver

The Administrator shall, after notice and opportunity for public hearing, waive application of this section to any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, unless he finds that such State does not require standards more stringent than applicable Federal standards to meet compelling and extraordinary conditions or that such State standards and accompanying enforcement procedures are not consistent with section 1857f–1(a) of this title.[17]

Since California was the only state which had adopted standards other than crankcase emission standards prior to March 30, 1966, it was the only one eligible for the waiver of federal preemption authorized by this section.

In 1970 Congress made further revisions in the Clean Air Act.[18] It directed the EPA Administrator[19] to publish national ambient air quality standards,[20] directed states to develop and submit plans for achieving compliance,[21] and mandated a 90 percent reduction in HC and CO levels in motor vehicle emissions by 1975 and a similar reduction in $NO_x$ levels by 1976.[22] These deadlines were subsequently pushed back on several occasions by both legislative and administrative action.[23] The preemption and waiver provisions were not substantively altered by the 1970 amendments.

In the years that followed California took advantage of its ability under Section 209(b) to obtain a waiver of federal preemption for state standards "more stringent than applicable Federal standards" and necessary to meet "compelling and extraordinary conditions." A number of manufacturers elected to market automobiles designed to meet the California standards in states other than California. Some sold California cars only in the western states. Others marketed them nationwide.[24] Since the California standards were in all respects at least as strict as the federal ones, California-equipped cars met federal standards as well, and were therefore eligible to receive the federal "certificate of conformity" without which they could not lawfully be introduced into commerce.[25] Their nationwide sale thus posed no problem under the Act.

## B. The 1977 amendments

In 1977 Congress undertook further revision of the Clean Air Act. Critical for present purposes was the decision to expand and strengthen the California waiver provi-

15. Section 209(b) now appears at 42 U.S.C. § 7543(b) (Supp. I 1977). As originally enacted it was § 208(b). See Air Quality Act of 1967, Pub. L. No. 90–148, 81 Stat. 485 (1967).

16. See 196 U.S.App.D.C. at ———, 606 F.2d at 1296–1298, infra.

17. 42 U.S.C. § 1857f–6a(b) (1976). Section 1857f–1(a), which is referred to in the portion quoted in text, relates in relevant part to technological feasibility and to federal certification requirements. It was transferred in 1977 to 42 U.S.C. § 7521(a) (Supp. I 1977).

18. Clean Air Amendments of 1970, Pub. L. No. 91–604, 84 Stat. 1676 (1970).

19. The "Administrator" was substituted for the Secretary throughout the Act. See id. at § 15(c)(2).

20. Section 109 of the Clean Air Act, 42 U.S.C. § 1857c–4 (1976) (revised and transferred in 1977 to 42 U.S.C. § 7409 (Supp. I 1977)).

21. Section 110 of the Clean Air Act, 42 U.S.C. § 1857c–5 (1976) (revised and transferred in 1977 to 42 U.S.C. § 7410 (Supp. I 1977)).

22. Section 202(b) of the Clean Air Act, 42 U.S.C. § 1857f–1(b) (1976) (revised and transferred in 1977 to 42 U.S.C. § 7521(b) (Supp. I 1977)).

23. See 1977 House Report, supra note 4, at 231–234.

24. JA 677, 782, 803.

25. A certificate of conformity is required as a prerequisite to introduction of a vehicle into commerce by § 203(a)(1) of the Clean Air Act, 42 U.S.C. § 7522(a)(1) (Supp. I 1977) (formerly 42 U.S.C. § 1857f–2(a)(1) (1976)).

sion—Section 209(b)—"to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare."[26] The House Committee recognized "California's longstanding belief that stringent control of oxides of nitrogen emission from motor vehicles may be more essential to public health protection than stringent control of carbon monoxide,"[27] and was aware that it might be technologically difficult to meet both the $NO_x$ standards California desired and the federal CO standard. Accordingly, Section 209(b) was rewritten to permit California to obtain a waiver of federal preemption so long as it determines that its emission control standards would be, *"in the aggregate,* at least as protective of public health and welfare as applicable Federal standards."[28] The result was to permit California to address its $NO_x$ problem while easing up somewhat on CO requirements.

Congress made it quite clear that it is the state that is charged with making the protectiveness determination. Indeed, the new Section 209(b) provides that the Administrator *shall* waive federal preemption unless he finds that California's decision was "ar-bitrary and capricious," that that state does not need its standards "to meet compelling and extraordinary conditions," or that the standards and accompanying enforcement procedures are not consistent with federal requirements concerning technical feasibility and certification set forth elsewhere in the Act.[29] In short, Congress consciously chose to permit California to blaze its own trail with a minimum of federal oversight.[30]

Two other facets of the 1977 amendments bear directly upon the meaning and import of the revised waiver provision. First, because cars meeting future California standards might well fail in some respects to meet comparable federal ones—and thus could not receive the certificate of conformity which is a prerequisite to lawful sale in this country—Congress added a new subsection 209(b)(3) to the waiver provision.[31] That subsection, the meaning of which is hotly contested in this litigation, provides:

(3) In the case of any new motor vehicle or new motor vehicle engine to which State standards apply pursuant to a waiver granted under paragraph (1), compliance with such State standards shall be

---

**26.** 1977 House Report, *supra* note 4, at 301–302.

**27.** *Id.* at 302.

**28.** Section 209(b) of the Clean Air Act, 42 U.S.C. § 7543(b) (Supp. I 1977) (emphasis added).

**29.** *Id.* Section 209(b) in its entirety reads:
(b)(1) The Administrator shall, after notice and opportunity for public hearing, waive application of this section to any State which has adopted standards (other than crank case emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. No such waiver shall be granted if the Administrator finds that—
(A) the determination of the State is arbitrary and capricious,
(B) such State does not need such State standards to meet compelling and extraordinary conditions, or
(C) such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title.

(2) If each State standard is at least as stringent as the comparable applicable Federal standard, such State standard shall be deemed to be at least as protective of health and welfare as such Federal standards for purposes of paragraph (1).
(3) In the case of any new motor vehicle or new motor vehicle engine to which State standards apply pursuant to a waiver granted under paragraph (1), compliance with such State standards shall be treated as compliance with applicable Federal standards for purposes of this subchapter.
42 U.S.C. § 7543(b) (Supp. I 1977).

**30.** *See* 1977 House Report, *supra* note 4, at 302:
The Administrator, thus, is not to overturn California's judgment lightly. Nor is he to substitute his judgment for that of the State. There must be clear and compelling evidence that the State acted unreasonably in evaluating the relative risks of various pollutants in light of the air quality, topography, photochemistry, and climate in that State, before EPA may deny a waiver.

**31.** 42 U.S.C. § 7543(b)(3) (Supp. I 1977).

treated as compliance with applicable Federal standards for purposes of this subchapter.

The second significant facet of the recent amendments to the Clean Air Act was the addition of a new Section 177,[32] which permits states other than California to opt under certain circumstances to enforce the California emission control standards within their borders. The Act does not require that the EPA Administrator conduct a separate waiver proceeding for each state that chooses to do so. Rather, it states simply that any state which has federally approved plans to bring itself into compliance with national air quality standards[33] may adopt and enforce auto emission standards provided those standards are identical to the California ones for which a waiver has already been obtained and provided both California and the adopting state have given manufacturers a two-year lead time.[34]

## C. The California waiver proceeding

The California Air Resources Board held hearings in the course of 1977 to establish that state's emission standards for 1979 and subsequent model years. Ultimately the Board adopted a rather complex series of primary standards, optional compliance schedules and techniques, and enforcement regulations.[35] In 1979 the California standards were to be in every respect at least as stringent as the federal ones.[36] In 1980, 1983, and subsequent years California planned to have accomplished precisely what Congress anticipated it would seek to accomplish[37]—the establishment of general applicable standards stricter than federal ones with regard to $NO_x$ and somewhat more lenient than federal ones with regard to $CO$.[38] And in 1981 and 1982 the relationship between state and federal standards was to vary depending upon which compliance options a manufacturer found preferable.[39]

California applied under Section 209(b) for a waiver of federal preemption so that it could place this package of standards into effect. On June 7, 1978, after various hearings and submissions by interested parties, the Acting EPA Administrator, Barbara Blum, granted California's application.[40] In addition to noting the narrowness of the congressionally mandated EPA review and concluding that she was unable to make findings which would have permitted her to deny a waiver for the California standards

---

**32.** 42 U.S.C. § 7507 (Supp. I 1977).

**33.** Section 177 applies to states that have not attained compliance with national standards. These are called "nonattainment states."

**34.** Section 177 states in its entirety:

§ 7507. **New motor vehicle emission standards in nonattainment areas**

Notwithstanding section 7543(a) of this title, any State which has plan provisions approved under this part may adopt and enforce for any model year standards relating to control of emissions from new motor vehicles or new motor vehicle engines and take such other actions as are referred to in section 7543(a) of this title respecting such vehicles if—

(1) such standards are identical to the California standards for which a waiver has been granted for such model year, and

(2) California and such State adopt such standards at least two years before commencement of such model year (as determined by regulations of the Administrator).

42 U.S.C. § 7507 (Supp. I 1977).

**35.** The California standards are described at some length in Waiver Decision, *supra* note 6, 43 Fed.Reg. at 25730–25735, JA 3–8. The standards were promulgated in CARB Resolution 77–48 (Sept. 29, 1977). That resolution is reproduced at JA 101.

**36.** Waiver Decision, *supra* note 6, 43 Fed.Reg. at 25730, JA 3.

**37.** *See* text at note 27 *supra*.

**38.** For 1983 and subsequent model years, the primary California $NO_x$ standard is 0.4 grams per mile while the comparable federal standard is 1.0 grams per mile. The California $CO$ standard for 1983 is 7.0 grams per mile while the federal standard is 3.4 grams per mile. *See* Waiver Decision, *supra* note 6, 43 Fed.Reg. at 25730 n.7, JA 3. The 1980 figures reflect an analogous relationship.

**39.** Under some options the California $CO$ standard was to be more lenient than the federal one. *Id.*

**40.** Waiver Decision, *supra* note 6.

and accompanying procedures,[41] the Acting Administrator noted that under Section 209(b)(3)[42] vehicles to which California standards applied would be deemed to have complied with federal standards and thus could receive federal certificates of conformity.[43] She stated, however, that such certificates would "cover only those vehicles introduced into commerce for sale in the State of California and possibly in States which have adopted California standards pursuant to section 177 of the Act."[44]

Various parties petitioned on various grounds for reconsideration of the Acting Administrator's decision.[45] Ford Motor Company, the Motor Vehicle Manufacturers Association (MVMA), and the Automobile Importers of America (AIA) challenged the determination that certificates of conformity issued for California-equipped cars would only cover vehicles introduced into commerce for sale in California. Ford argued that the California standards were in meaningful respects more stringent than the federal ones and that there was in consequence no reason to forbid nationwide sale of California-equipped cars. It supplied the EPA with a substantial amount of data in support of this proposition and observed as well that California cars would cost less and use less gasoline than vehicles designed to meet federal standards. In addition, it asserted that Congress would not radically have altered the past practice of permitting nationwide sale of California cars without explicitly stating that it intended to do so.[46]

On November 1, 1978 the Administrator, Douglas M. Costle, denied the Ford and MVMA petitions on grounds that the revised version of Section 209(b) left EPA without discretion to permit nationwide sale

of California cars.[47] Accordingly, he concluded that Ford's data concerning the asserted public benefits of such sale were irrelevant, or at least should have been addressed to Congress and not to the Agency.[48] The AIA petition was denied March 9, 1979 on similar grounds.[49]

Ford and MVMA sought review in this court, although the latter's petition was subsequently dismissed on its own motion. AIA is before this court as an intervenor in support of Ford.

## II. ANALYSIS

Ford argues that the Administrator erred in concluding that the Clean Air Act as amended in 1977 forbids nationwide sale of California-equipped cars unless those cars also meet federal emission control standards. As a starting point, it maintains that Congress would not *sub silentio* have forbidden the Agency's well established prior practice of permitting California cars to be sold in other states.[50] Rather, it asserts, sale of such cars nationwide is still permitted by the Act, subject only to the "reasoned decision" of the Administrator as to the scope of the certificates of conformity issued for California cars. In the instant case, Ford continues, the Administrator improperly failed to consider studies and data which should have informed the decision-making process. Accordingly, the reasoned decision contemplated by Congress was never made. Indeed, petitioner concludes, the Administrator was not free to terminate the prior practice of permitting nationwide distribution without following the notice and comment rulemaking procedures set

**41.** *Id.*, 43 Fed.Reg. at 25729, JA 2.

**42.** *See* text at note 31 *supra.*

**43.** Waiver Decision, *supra* note 6, 43 Fed.Reg. at 25735, JA 8.

**44.** *Id.*

**45.** JA 651, 673, 790, 802.

**46.** JA 673 -679 (and following attachments).

**47.** JA 15, 25.

**48.** JA 30–31.

**49.** The letter from Acting Administrator Blum denying the petition was filed with this court on March 29, 1979 and made a part of the record in this case.

**50.** This argument is a centerpiece of the AIA brief. *See* intervenor's brief at 8–16.

forth in the Administrative Procedure Act.[51]

We disagree on all counts. In our view, the 1977 amendments significantly altered the California waiver provision and the relationship between California and federal emission control standards. As a result of that alteration the once unexceptional practice of distributing California cars nationwide was rendered unlawful for the simple reason that such cars will no longer comply with federal standards. Accordingly, we agree with the Administrator that Ford's data concerning the environmental effects and consumer benefits that inhere in the California standards were irrelevant to the question before the Agency. Nor were rulemaking procedures required. EPA did not promulgate a new rule, it merely recognized and effectuated changes wrought by Congress.[52] However meritorious Ford's position with regard to those changes may be, it was then and is now being presented to the wrong forum. Neither the Administrator nor this court is free to reverse the congressional determination.

Our starting point is the statute itself. Congress knew precisely what it was doing when it added the "in the aggregate" language to the California waiver provision. Indeed, it included a new Section 209(b)(3) to deal specifically with any problems posed by vehicles that comply with California standards but not with federal ones. That section provides that "[i]n the case of any new motor vehicle or new motor vehicle engine *to which State standards apply* pursuant to a waiver granted under paragraph (1), compliance with such State standards shall be treated as compliance with applicable Federal standards * * *."[53] We take this to mean precisely what it says—that vehicles "to which State standards apply" and which meet those standards shall be treated as complying with federal standards and thus may receive certificates of conformity and be introduced into commerce. But the only vehicles "to which State standards apply" are, as the Government points out, those introduced into commerce for sale in California.[54] Thus Section

---

**51.** 5 U.S.C. § 553 (1976). In support of its contentions in this regard Ford notes that notice of the EPA proceedings made no reference to the issue of nationwide distribution of California cars, that that issue received scant attention in the course of those proceedings, and that the decision to limit sale of California cars will have a substantial impact on manufacturers. We do not dispute these points. Our quarrel is with the proposition that additional procedures were required.

**52.** That any adverse impact on Ford stems not from a discretionary act of the Agency, but rather from legislative changes made by Congress, disposes of petitioner's procedural argument. Rulemaking is not required by the APA when an agency merely interprets and carries out congressional revisions as opposed to actually exercising delegated legislative powers. *See* 5 U.S.C. § 553(b)(A) (1976).

**53.** 42 U.S.C. § 7543(b)(3) (Supp. I 1977) (emphasis added).

**54.** The Administrator suggested, but did not decide, that California-equipped cars could also be sold in states which opt to enforce the California standards pursuant to § 177 of the Clean Air Act, 42 U.S.C. § 7507 (Supp. I 1977). That Congress intended the sale of such vehicles in § 177 states seems clear for the simple reason that any other view would render the section

meaningless. Ford argues that the reading of § 209(b)(3) which we adopt renders this result impossible. It notes that § 209(b)(3) refers to vehicles "to which State standards apply pursuant to a waiver" and urges that a literal reading of this language must focus not only on the first five words, but also on the last four. Such a reading, the company claims, would have the effect of forbidding sale of California cars even in § 177 states because California standards do not apply in those states "pursuant to a waiver," but rather result from state-by-state decisions.

We find this difficulty more imagined than real. First, we see no reason why our refusal to accept Ford's invitation to ignore the words we emphasize forces us to go to the other extreme and seek the most literal possible construction of the entire clause. Second, we note that California standards apply in § 177 states pursuant both to the original California waiver and to the states' election to enforce those standards. Thus we find that even a literal reading does not lead to the absurdity Ford finds inevitable. Third, even if Ford had persuaded us that a literal reading of the entire clause is problematic, it would not follow that we should simply ignore that clause. A far more reasonable response would be to give effect to the words that seem consistent with the balance of the statute and construe the others in a way that avoids clear absurdity.

209(b)(3) seems strongly to support the Agency's position.[55]

Ford argues, however, that we should adopt a far broader reading of Section 209(b)(3). It asks, in effect, that we interpret the provision to mean that any vehicle, no matter where destined for sale, that complies with California standards for which a waiver has been granted shall be treated as complying with federal standards as well. We find no support in the text itself or in the legislative history for such a reading. Further, our perception of the structure of the Act and the underlying policies is solidly to the contrary.

In the first place, the argument that Congress would not have altered EPA's long-standing practice of permitting nationwide distribution of California cars without declaring that it intended to do so is simply not persuasive. In large measure it depends upon an ultimately misleading characterization of the prior Agency practice. Until the 1977 amendments, as we have already noted, California cars complied with federal standards. Thus their distribution outside of California was permissible pursuant to the general practice of permitting sale in such states of vehicles that met federal standards and forbidding sale of those that did not. In the wake of the 1977 amendments there arose the possibility that California-equipped cars would no longer comply as a matter of course with federal requirements. That fact left Congress with two choices—it could nonetheless permit their nationwide sale, and thus depart from the practice of permitting such sale only for cars complying with federal standards, or it could restrict their sale, and thereby adhere

without change to the prior rule permitting nationwide distribution only of complying vehicles. We think the former choice would have amounted to an extraordinary and dramatic departure—one not lightly to be inferred. The latter, in contrast, was fully consistent with what went before. Accordingly, having found no break with past practice, we are at a loss to see why Congress' supposed silence in this regard poses any difficulty for the Administrator's position.

Our conclusion is only reinforced by a broader look at the structure of the statute. At the risk of repeating ourselves, several points bear emphasis. First, there is no question that Congress deliberately chose in 1977 to expand the waiver provision so that California could enforce emission control standards which it determined to be in its own best interest even if those standards were in some respects less stringent than comparable federal ones.[56] Second, it is equally clear that it was Congress itself that set those comparable federal standards.[57] Third, the statute does not provide for any probing substantive review of the California standards by federal officials. Rather, it instructs the Administrator to grant a waiver *unless* he determines that California acted arbitrarily and capriciously when *it* concluded that its standards were in the aggregate as protective as federal ones.[58] With these features as the backdrop, the extraordinary nature of petitioner's position becomes clear. Ford is asking this court to declare that Congress intended to make standards adopted by California for its own particular problems, and never

---

**55.** What legislative history there is seems consistent with this view. The House Committee, for example, noted that

> once a waiver is granted to California, compliance with the State's standards is deemed to satisfy the Federal requirements *in California.*

1977 House Report, *supra* note 4, at 302 (emphasis added).

We note as well that an agency's contemporaneous interpretation of its own statute is not lightly to be ignored. *Volkswagenwerk v.*

*FMC*, 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968).

**56.** *See* text at notes 26 & 27 *supra.*

**57.** *See* § 202(b)(1)(A) of the Clean Air Act, 42 U.S.C. § 7521(b)(1)(A) (Supp. I 1977). *See also* S. Rep. 91–1196, 91st Cong., 2d Sess. 25–27 (1970).

**58.** *See* text at notes 29 & 30 and note 30 *supra.* The statute provides for no determination at all as to the effect of the California standards on other parts of the country.

substantively reviewed for stringency or national protectiveness by federal officials, an option which auto manufacturers can choose in the rest of the country as an alternative to compliance with the federal standards which Congress determined are in the best interests of the nation. We find this reading to be wholly implausible.[59]

Ford attempts to escape the force of our position by arguing (1) that the reasoned decisionmaking of the EPA Administrator will serve as a check to prevent auto manufacturers from abusing overly lenient or regionally inappropriate California standards, and (2) that Congress anticipated that California standards would be in total more stringent and more protective of the public health and welfare than federal ones. We remain unpersuaded. There is no indication in either the statute or the legislative history that Congress intended to permit the Administrator to supplant its emission control regulations with those of California, no matter how sagacious and beneficial the latter may be.[60] Nor is there any evidence that the Administrator is supposed to determine whether California's standards are in fact sagacious and beneficial. Indeed, if Ford is correct we must come to the rather curious conclusion that Congress intended the Administrator to approach every new set of California standards wearing two hats—one expressly provided by statute and the other a product of elusive inference.

Under the first he would undertake the cursory review set forth in Section 209(b) for purposes of deciding whether to grant California a waiver of preemption; and under the other he would turn around and, apparently in the course of a full-fledged rulemaking proceeding, plumb the merits of the California standards and their likely effect on nationwide pollution for purposes of deciding on the appropriate scope of a certificate of conformity. Far less unwieldy, and considerably more plausible, is the Government's construction—that the Administrator is charged with undertaking a single review in which he applies the deferential standards set forth in Section 209(b) to California and either grants or denies a waiver without exploring the consequences of nationwide use of the California standards or otherwise stepping beyond the responsibilities delineated by Congress.

In our judgment, Ford's contentions concerning the congressional expectation that California standards would be stricter than federal ones are similarly wide of the mark. First, the indicia of congressional understanding are not unambiguous. While Ford is able to point to remarks by several legislators to the effect that the California standards would be tougher,[61] the House Report refers quite specifically to *"California's* longstanding belief that stringent control of [$NO_x$] may be more essential * * * than stringent control of [CO]"[62] and not to

---

**59.** Ford's reading of § 209(b)(3) is also at odds with the congressional decision to include in the revised Act a new § 177 permitting states with ambient air problems to choose to enforce the California emission control standards rather than federal ones. *See* 42 U.S.C. § 7507 (Supp. I 1977), quoted at note 34 *supra.* Had Congress provided for and fully anticipated the nationwide distribution of California cars, as Ford claims, it is inconceivable that it would also have added a section that permits individual states to elect to enforce the California standards. On the contrary, § 177 clearly presupposes that unless a particular state chooses to adopt California's standards the cars within its boundaries will be governed by and will meet federal standards.

**60.** Ford suggests that the federal CO standards are not as inflexible as the Government would have us believe. It notes that under § 202(b)(5) of the Clean Air Act, 42 U.S.C. § 7521(b)(5)

(Supp. I 1977), the Administrator may temporarily relax the federal standard if the technological obstacles to compliance appear insurmountable. While this is certainly true, we fail to see how it supports the proposition that the Administrator can also waive compliance with the federal standard on a categorical and nationwide basis in favor of compliance with California standards when there is no statutory basis for such action and no showing of technological exigencies is made.

**61.** *See* petitioner's reply brief at 9–11 (*citing* 123 Cong. Rec. H8662–H8663 (daily ed. Aug. 4, 1977) and *id.* at H5061–H5062 (daily ed. May 25, 1977)).

**62.** 1977 House Report, *supra* note 4, at 302 (emphasis added).

any generalized congressional belief in this regard. Second, even if many congressmen expected the California standards to be more protective, nothing in the Act requires that they be so. In fact, any such requirement, and especially a requirement geared to pollution conditions outside of California, would have been inconsistent with the broad thrust of the 1977 amendments, which was to expand the deference accorded to California.[63] Third, contrary to Ford's assertions, the presence of Section 177—the provision authorizing other states with air quality problems to adopt the California standards [64]—does not force the conclusion that Congress was certain California standards would be more protective or anticipated nationwide distribution of California cars. Section 177 could be a benefit to electing states whenever California standards were *either* more stringent in general than federal ones *or* more suited to those states' particular problems such as high altitude pollution [65] or substantial $NO_x$ concentrations.[66] Furthermore, as we have noted,[67] Section 177 itself seems inconsistent with the Ford position in that it presupposes that a given state can *choose* to enforce the California standards—a presupposition which in turn suggests that absent the exercise of that choice the new vehicles sold within that state will be federally equipped and not California equipped.

More fundamentally, our position does not turn on whether congressmen did or did not assume the California standards would be more stringent. Nor does it depend on whether those standards actually are more stringent. The crucial point is that in no sense does the statutory scheme ensure that the California standards would be as protective as federal ones if applied nationwide. Section 209(b) merely requires California to make its own protectiveness determination prior to applying for a waiver. It was clearly the intent of the Act that that determination focus on local air quality problems—problems that may differ substantially from those in other parts of the nation.[68] Yet Congress made no provisions for any federal scrutiny of the impact of substituting California standards for federal ones in the other 49 states. We see no reason to read such a provision into a statute from which it is conspicuously absent, and in light of that absence we find Ford's position untenable.

## III. CONCLUSION

Congress was faced in 1977 with the task of accommodating a number of different state and federal interests. It seems to have decided to accomplish that task by permitting California (and Section 177

**63.** See 196 U.S.App.D.C. at ——————, 606 F.2d at 1296–1297, *supra.*

**64.** See 196 U.S.App.D.C. at ——————, 606 F.2d at 1297–1298, *supra.*

**65.** Ford argues that California-equipped cars would be particularly appropriate in states like Colorado where altitude compounds air pollution problems. This may well be true. And Colorado presumably can, under § 177, opt to enforce the California standards within its boundaries.

**66.** NOx, of course, is a key problem in California and led to the standards at issue in the first place.

**67.** See note 59 *supra.*

**68.** Ford and AIA suggest to varying degrees that California is a microcosm of the entire nation and, as such, has no particularized problems the resolution of which would require

emission control standards inappropriate to the rest of the country. This may or may not be completely true. The fact remains, however, that Congress expected California to be putting its interests first and there is no *guarantee* that those interests are congruent with the interests of the nation as a whole. Parenthetically, we note that Ford and AIA today sound a quite different theme than did the industry of a decade and a half ago when Congress considered including in the federal law the then applicable California standards. Writing in 1970, the Senate Committee on Public Works described the industry's earlier position as follows:

The automobile industry argued that writing standards into Federal law would not be appropriate because California's problem of automotive air pollution was unique and that different degrees of control for different pollutants would be needed to deal with problems in other areas of the nation.

S. Rep. 91–1196, 91st Cong., 2d Sess. 24 (1970).

states) [69] to enforce California standards while requiring cars sold in other states to meet federal ones. While it appears reasonable on its face, it is at least conceivable that this was not the best possible accommodation. Certainly it has costs. Indeed, if Ford is to be believed, the present case is a sort of technological fortuity which illustrates one of those costs. We are told that California has come up with a better mousetrap—a set of emission control standards that would be more protective of the environment throughout the country than the federal standards and yet both less expensive for manufacturers to meet and more fuel-efficient. Perhaps Congress would have been well advised to draft a statute that establishes a procedure for determining whether this asserted fortuity has in fact occurred and, if so, permits the nation to take advantage of it in the manner Ford advocates. But we think that Congress did not draft such a scheme. And the mere (and thus far only supposed) occurrence of the fortuity which illustrates a cost of that choice does nothing to alter our opinion or make the original choice itself less reasonable. Congress could well have concluded that the sort of scheme Ford argues for would be too cumbersome, the presently claimed fortuity too unlikely, and its asserted benefits too small or hard to verify. Nothing in such a legislative choice is so odd or irrational as to require this court to strain the statutory language, infer new procedures, or otherwise alter the accommodation reached by Congress.

Accordingly, the Administrator's determination with regard to nationwide sale of California cars is

*Affirmed.*

**69.** *See* note 54 *supra.*

**1.** On this subject the Act previously provided:
Sec. 208 "(b) The Secretary shall, after notice and opportunity for public hearing, waive application of this section to any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, unless he finds that such State does not require standards more stringent than applicable Federal standards to meet compelling and extraordinary conditions or that such

MacKINNON, Circuit Judge, dissenting:

The issue in this case is whether California-equipped automobiles can be sold outside California. Specifically, it is whether the Clean Air Act Amendments of 1977 were intended to put an end to the right of manufacturers to sell motor vehicles in states other than California when the vehicles are equipped with pollution control devices approved for California which satisfy standards that are "in the aggregate, at least as protective of public health and welfare as applicable Federal standards." In my judgment, the 1977 amendments cannot fairly be read to forbid such sales. If Congress had intended such a restrictive burden on interstate commerce it would have said so. It did not.

### I

The Administrator's position that he is powerless to permit the sale of California-equipped motor vehicles outside California primarily rests on his misconceptions of the impact of the 1977 amendments on section 209, 42 U.S.C. § 7543 (Supp. I 1977), the California waiver provision.

Before 1977, section 209 required the Administrator to waive preemption for California if that State's standards were "more stringent" then applicable federal standards.[1] While this provision was in effect, manufacturers were able to sell California-equipped motor vehicles outside California. Congress was aware of this practice in undertaking to amend the Clean Air Act in 1977.[2] The 1977 amendments changed the law to require the Administrator to waive preemption to California if that State's

State standards and accompanying enforcement procedures are not consistent with section 202(a) of this title.
Pub.L.No. 90–148, 81 Stat. 501 (emphasis added).

**2.** *See, e. g.,* S.Rep.No. 95–127, 95th Cong., 1st Sess. 87 (1977); *Proposed Amendments to the Clean Air Act as amended: Hearings on S.251, S.252, and S.253 Before the Subcomm. on Environmental Pollution of the Senate Comm. on Environment and Public Works,* 95th Cong., 1st Sess., Part IV, at 56 (February 15, 1977) (statement of J. Jensen).

emission standards will be *"in the aggregate, at least as protective of public health and welfare* as applicable Federal standards."[3]

The intent of this amendment, however, was not to allow California to relax its rigorous emissions program or to abandon the unique role it occupies in emissions control. Quite the contrary, Congress intended California to press its efforts at combatting emissions from motor vehicles and to continue its status as a pioneer in such efforts. The only reason for the change in the language of Section 209 was to permit California to adopt standards for oxides of nitrogen considerably more stringent than the applicable federal standards; Congress recognized the "theoretical possibility" that under the original section 209 (§ 208 of the 1967 Act, 81 Stat. 501) this might not be technologically feasible if California were bound by the stringent carbon monoxide standard.[4]

The Administrator here focuses solely on the fact that California's carbon monoxide standard is lower than the federal level and therefore concludes that California-equipped vehicles do not meet federal standards. But this reasoning ignores the more stringent standard for oxides of nitrogen, and, more important, completely neglects the fact that the California standards are *in the aggregate* held to be at least as protective of public health and welfare as the federal standards. The overall (aggregate) protectiveness of the California standards as measured by the overall protectiveness of the federal standards is the key. The Administrator's decision to waive preemption of the federal standards indicates that he can find no evidence that the California standards are not in the aggregate at least as protective of public health and welfare as applicable federal standards. To say that an amendment designed to strengthen California's emission control program—a program which has consistently run ahead of federal efforts—somehow diminishes the effectiveness of the California standards vis-a-vis the federal standards is to read into the amendments a conclusion that Congress never expressed.

## II

If anything, the 1977 amendments indicate that Congress regarded the California standards to be superior to federal standards. In section 177 of the Act (42 U.S.C. § 7507), Congress permits "nonattainment states," *i. e.,* states which have failed to reach certain air quality levels, to adopt *California's* emissions standards.[5] The states' power to opt for California standards is not contingent upon having a different or peculiar problem with oxides of nitrogen, nor is it conditioned upon adherence to federal carbon monoxide levels. In

---

**3.** 42 U.S.C. § 7543(b)(1) (Supp. I 1977) (emphasis added).

  (b)(1) The Administrator shall, after notice and opportunity for public hearing, waive application of this section to any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. No such waiver shall be granted if the Administrator finds that—

  (A) the determination of the State is arbitrary and capricious,

  (B) such State does not need such State standards to meet compelling and extraordinary conditions, or

  (C) such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title.

**4.** H.R.Rep.No. 95–294, 95th Cong., 1st Sess. 302 (1977).

**5.** 42 U.S.C. § 7507 (Supp. I 1977).

  Notwithstanding section 7543(a) of this title, any State which has plan provisions approved under this part may adopt and enforce for any model year standards relating to control of emissions from new motor vehicles or new motor vehicle engines and take such other actions as are referred to in section 7543(a) of this title respecting such vehicles if—

  (1) such standards are identical to the California standards for which a waiver has been granted for such model year, and

  (2) California and such State adopt such standards at least two years before commencement of such model year (as determined by regulations of the Administrator).

July 14, 1955, c. 360, Title I, § 177, as added Aug. 7, 1977, Pub.L. 95–95, Title I, § 129(b), 91 Stat. 750.

other words, a state's decision to impose California's emissions control regulations does not turn on the considerations the Administrator invoked to ban the sale of California-equipped vehicles outside California. The unmistakable congressional assumption underlying section 177 is that states suffering particularly severe air quality problems ought to be able to adopt the emissions control program that is most effective in the aggregate, and Congress turned to California to provide that program.[6] Had Congress been concerned about the minimal differences between the specific standards for various pollutants, it would hardly have given the states this option.

## III

The Administrator regards as "critical" the language in section 209(b)(3), which provides that "[i]n the case of any new motor vehicle or new motor vehicle engine *to which State standards apply pursuant to a waiver* granted under [§ 209(b)(1)], compliance with such State standards shall be treated as compliance with applicable Federal standards for purposes of this subchapter." 42 U.S.C. § 7543(b)(3) (Supp. I 1977) According to the Administrator's view, this provision means that California standards apply only to California-equipped motor vehicles required by California law to meet California standards. This reasoning imports into the section a geographical limitation that is unwarranted by the text or purpose of the section.

The provision refers only to motor vehicles, not to states. Before 1977, all motor vehicles which complied with the California

standards adopted pursuant to a waiver could be sold in all fifty states; as between the federal and California standards, the latter *applied* to these vehicles. If the vehicle is designed and certified to meet California standards, to my mind those standards apply to the motor vehicle, and pursuant to a waiver may be sold outside California. It is reasonable to construe the intent of Congress as recognizing that a motor vehicle that complies *in the aggregate* with federal standards in California should also be deemed as complying in the aggregate with federal standards elsewhere. The obvious purpose of section 209(b)(3) is to ensure that manufacturers will not be faced with meeting both federal and California standards. Because federal law requires a federal certificate of conformity as a condition precedent to the sale of motor vehicles, and because compliance with California's superior emissions control program may not precisely dovetail with federal requirements, some provision was needed to make a California certificate tantamount to a federal one. Section 209(b)(3) fulfills that need. The Administrator attempts to read the statute as though Congress had enacted that "compliance with such State standards shall be treated as compliance *only in California* with applicable Federal standards." But Congress did not so legislate. Congress' refusal to provide such a geographical limitation indicates it intended the provision to apply generally.

## IV

On the Administrator's reading, California-equipped motor vehicles can only be

---

**6.** The legislative history of section 177 is replete with statements expressing Congress' view that the California standards were stricter than corresponding federal standards—and therefore generally more protective of the public health and welfare—despite the change in section 209(b). *See, e. g.,* 123 Cong.Rec. H5061 (daily ed. May 25, 1977) (remarks of Rep. Rogers, Chairman of the Subcommittee handling the bill) (states with "heavy pollution problem[s]" can decide to adopt the "more strict" California standards; section 177 designed to give states the option "to grant greater health protection" to citizens); *id.* at H5062 (remarks of Rep. Maguire) (states with "tougher" pollution problems should be able to adopt Califor-

nia's "tougher standards"); *id.* (remarks of Rep. Wirth) (section 177 poses choice between "the softer [federal] standards or the very tough California standards").

It is no answer to say that section 177 leaves the choice with the states, not the manufacturers. The choice in section 177 is whether *to require* California standards. The Administrator's decision here turns on the facile notion that one California standard might be less stringent than its federal counterpart. The emphasis on section 177 is to show that this did not diminish Congress' view that California's standards were in general more protective of public health than the federal standards. Congress' judgment in that regard should control.

sold within the geographic area purportedly described in section 209(b)(3), namely, California. Yet in section 177, Congress plainly indicated that it intended that vehicles meeting the California standards be sold in states electing to adopt California standards. This result can only be achieved through section 209(b)(3). The Administrator's geographically-restricted construction of that provision would prohibit that result. Only if section 209(b)(3) is read to avoid any geographic limitation can the purpose of section 177 be accomplished. Congress saw no problem with the application of section 209(b)(3) to motor vehicles in section 177 states because it recognized that once a waiver had been granted for California standards, those standards would apply to all California-equipped motor vehicles irrespective of where they were sold or driven. Viewed in tandem, sections 209 and 177 mean that *only* California-equipped motor vehicles can be sold in California and states choosing California standards, but California-equipped motor vehicles can be sold elsewhere.

I respectfully dissent.