United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 22, 1998 Decided April 24, 1998

 No. 96-1392

 Motor & Equipment Manufacturers Association, et al., 

 Petitioners

 v.

 Mary D. Nichols, 

 Assistant Administrator and 

 Environmental Protection Agency, 

 Respondents

 American Automobile Manufacturers Association, et al., 

 Intervenors

 

 


 No. 96-1397

 Motor & Equipment Manufacturers Association, et al., 

 Petitioners

 v.

 Environmental Protection Agency and 

 Carol M. Browner, Administrator, United States 

 Environmental Protection Agency, 

 Respondents

 American Automobile Manufacturers Association and 

 Association of International Automobile 

 Manufacturers, Inc., 

 Intervenors

 On Petitions for Review of an Order of the 

 Environmental Protection Agency

 Michael J. Conlon argued the cause in No. 96-1392 for 
petitioners, with whom Marc L. Fleischaker, Donald B. 
Mitchell, Jr., Evan S. Stolove, John Russell Deane, III, 
Christopher J. Kersting, Basil J. Mezines and Michael T. 
Reid were on the briefs. Louis R. Marchese entered an 
appearance.

 Michael J. Horowitz, Attorney, Environmental Protection 
Agency, argued the causes for respondents, with whom Lois 
J. Schiffer, Assistant Attorney General, U.S. Department of 
Justice, Jeffrey K. Lee, Attorney, and Jonathan Z. Cannon, 
General Counsel, Environmental Protection Agency, were on 
the brief. Karen L. Egbert, Attorney, U.S. Department of 
Justice, entered an appearance.


 Clifford T. Lee, Deputy Attorney General, State of Califor-
nia, argued the cause in No. 96-1392 for intervenor California 
Air Resources Board, with whom Daniel E. Lungren, Attor-
ney General, and Michael Terris, Senior Staff Counsel, Cali-
fornia Air Resources Board, were on the brief.

 John H. Beisner, John A. Rogovin, Martha Dye, Richard 
A. Penna, Howard E. Shapiro, V. Mark Slywynsky, Charles 
H. Lockwood and John T. Whatley were on the brief in No. 
96-1392 for intervenors American Automobile Manufacturers 
Association and Association of International Automobile Man-
ufacturers, Inc.

 Marc L. Fleischaker argued the cause in No. 96-1397 for 
petitioners, with whom Donald B. Mitchell, Jr., Evan S. 
Stolove, John Russell Deane, III, Christopher J. Kersting, 
Basil J. Mezines, Michael J. Conlon and Michael T. Reid 
were on the briefs. Louis R. Marchese entered an appear-
ance.

 John H. Beisner argued the cause in No. 96-1397 for 
intervenors, with whom John A. Rogovin, Martha Dye, Rich-
ard A. Penna, Howard E. Shapiro, V. Mark Slywynsky, 
Charles H. Lockwood and John T. Whatley were on the brief.

 Before: Edwards, Chief Judge, Wald and Rogers, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Rogers.

 Rogers, Circuit Judge: These two appeals present Clean 
Air Act ("CAA" or "the Act") challenges to California's latest 
round of automobile on-board emissions diagnostic device 
("OBD") regulations. Petitioners are a number of associa-
tions that represent businesses that manufacture, rebuild, and 
sell car parts in what is known as the automobile "aftermar-
ket," in that the parts they make and sell are meant to 
replace the parts installed by the original automobile manu-
facturers. In the first appeal, they challenge the Environ-
mental Protection Agency's ("EPA") decision to permit Cali-
fornia to enforce its own regulations of the OBDs pursuant to 
section 209(b) of the CAA (the "waiver decision"). In the 
second appeal, petitioners challenge EPA's rule deeming com-


pliance with the California diagnostic device regulations to 
constitute compliance with the federal diagnostic device regu-
lations (the "deemed-to-comply" rule).

 Petitioners contend that both the waiver decision and the 
deemed-to-comply rule run afoul of CAA subsections 
202(m)(4) and (5). Those subsections require the data collect-
ed by the diagnostic devices to be easily accessible and 
understandable to all mechanics who service automobiles, 
whether they are independent or affiliated with an automobile 
manufacturer. EPA concluded that California's regulations 
complied with subsections (m)(4) and (5), and we defer to the 
agency's reasonable interpretation of the CAA. Preliminari-
ly, however, we hold that certain parts of the petitions are 
moot in view of the most recent revisions to the California 
regulations, and that our review of one challenge to the 
deemed-to-comply rule based on CAA section 202(b)(1)(C) is 
barred for failure to exhaust administrative remedies. Peti-
tioners have standing to challenge EPA's deemed-to-comply 
rule, however, and timely presented their challenge to that 
rule. Furthermore, we hold that EPA's waiver decision was 
not inconsistent with the CAA. In sum, the agency acted 
within its authority in promulgating both rules. Accordingly, 
we deny the petitions in part and dismiss in part.

 I.

A. The Clean Air Act

 The Clean Air Act, 42 U.S.C. ss 7401-7671(q) (1988 & 
Supp. V 1993), regulates air pollution by establishing air 
quality standards for certain pollutants and controlling the 
emissions of approximately 189 hazardous pollutants. See 
CAA ss 109, 112, 42 U.S.C. ss 7409, 7412.1 The Act estab-

__________
 1 Motor vehicles are a significant source of carbon monoxide 
("CO"), nitrogen oxide ("NOx"), volatile organic compounds 
("VOCs"), and other toxic air pollutants regulated under the Act. 
See Inspection/Maintenance Program Requirements, 57 Fed. Reg. 
52,950, 52,981 (1992) (codified at 40 C.F.R. pt. 51). See generally 
Arnold W. Reitze, Jr. & Barry Needleman, Control of Air Pollution 


lishes a two-pronged federal-state approach limiting motor 
vehicle pollution. See generally Engine Mfrs. Ass'n v. EPA, 
88 F.3d 1075, 1078 (D.C. Cir. 1996). The states regulate 
automobiles after they have been purchased by consumers 
through inspection and maintenance programs. See CAA 
ss 104, 106, 111a(b)(4), (a)(2)(B), 42 U.S.C. ss 7504, 7506, 
7511a(b)(4), (a)(2)(B). Inspection and maintenance programs 
are designed to identify and ensure the repair of in-use 
automobiles that are emitting excessive pollutants. Subchap-
ter I of the Act is primarily concerned with the ground rules 
for the implementation of these post-purchase programs by 
the states. Subchapter II of the Act vests in the federal 
government the almost exclusive responsibility for establish-
ing automobile emission standards for new cars. See CAA 
ss 202, 209(a), 42 U.S.C. ss 7521, 7543(a). One state, Cali-
fornia, is permitted to establish its own automobile emissions 
standards for new cars. See CAA s 209(b), 42 U.S.C. 
s 7543(b); Engine Mfrs. Ass'n, 88 F.3d at 1078 & n.9. Other 
states are permitted to adopt California's standards instead of 
those promulgated by the federal government. See CAA 
s 177, 42 U.S.C. s 7507. The effect of the Clean Air Act is 
that new "motor vehicles must be either 'federal cars' de-
signed to meet EPA's standards or 'California cars' designed 
to meet California's standards." Engine Mfrs. Ass'n, 88 F.3d 
at 1080.

 The California exception is intended "to afford California 
the broadest possible discretion in selecting the best means to 
protect the health of its citizens and the public welfare." 
H.R. Rep. No. 95-294, at 301-02 (1977), quoted in Motor and 
Equip. Mfrs. Ass'n, Inc. v. EPA, 627 F.2d 1095, 1110 (D.C. 
Cir. 1979) ("MEMA I"). However, California is required to 
determine that its standards will be "in the aggregate, at 
least as protective of public health and welfare as applicable 
Federal standards" before promulgating them. CAA 
s 209(b)(1), 42 U.S.C. s 7543(b)(1). Furthermore, California 
may only adopt and enforce its own emission standards after 

__________
from Mobile Sources through Inspection and Maintenance Pro-
grams, 30 Harv. J. on Legis. 409, 410-414, 448-49 (1993).


receiving a waiver of preemption from the EPA. See Motor 
Vehicle Mfrs. v. New York State Dep't of Envtl. Conservation, 
17 F.3d 521, 526 (2d Cir. 1994). The EPA Administrator, in 
turn, may only deny California's waiver application if she 
finds that (1) the state's protectiveness determination is arbi-
trary or capricious, (2) California does not need separate state 
standards to meet "compelling and extraordinary conditions," 
or (3) California's "standards and accompanying enforcement 
procedures are not consistent with" section 202(a) of the Act 
[42 U.S.C. s 7521(a)]. CAA s 209(b)(1), 42 U.S.C. 
s 7543(b)(1).

 OBDs were first installed by automobile manufacturers in 
1981.2 OBDs monitor, control, and record the emissions 
released by automobile engines.3 They also store information 
about emissions system faults for later retrieval.4 The de-
vices warn drivers of problems through the "check engine" 
lights placed on the dashboards of new cars.

 These lights illuminate when the vehicle's monitoring 
 system detects an engine malfunction. At the same time 
 the light illuminates, trouble codes indicating the source 
 of the problem are stored in the vehicle's computer, 
 where they may be accessed by repair personnel, some-
 times using a plug-in tool to aid in diagnosis.

Control of Air Pollution from New Motor Vehicles, 56 Fed. 
Reg. 48,272, 48,274 (1991) (proposed Sept. 24, 1991).

 In 1990 Congress amended the CAA to require EPA to 
mandate and regulate the installation of OBDs in all new 
cars. See CAA Amendments, P.L. No. 101-549, s 202(m), 
104 Stat. 2399 (codified at 42 U.S.C. s 7521(m) (Supp. V 
1993)). Through the use of these devices, Congress sought 
accurate identification of "emission-related systems deteriora-
tion or malfunction," in order to "alert[ ] the vehicle's owner 

__________
 2 See S. Rep. No. 101-228, at 97 (1990), reprinted in 1990 
U.S.C.C.A.N. 2285, 3482.

 3 See S. Rep. No. 101-228, at 97, reprinted in 1990 
U.S.C.C.A.N. at 3482.

 4 See id. 


or operator to the likely need for emission-related ... main-
tenance or repair." CAA s 202(m)(1), 42 U.S.C. 
s 7521(m)(1). Congress also hoped to "facilitate the ability of 
repair facilities, including independent repair facilities, to 
properly diagnose emission component malfunctions." 5 In 
order "to assure that all vehicle manufacturers use [OBDs] 
that can be readily accessed and interpreted," 6 Congress 
instructed EPA to promulgate regulations that

 requir[e] (subject to the provisions of section 7542(c) of 
 this title regarding the protection of methods or process-
 es entitled to protection as trade secrets) manufacturers 
 to provide promptly to any person engaged in the repair-
 ing or servicing of motor vehicles ... any and all infor-
 mation needed to make use of the emission control 
 diagnostics system....

CAA s 202(m)(5), 45 U.S.C. s 7521(m)(5). The statute also 
requires

 (A) that any connectors through which the emission con-
 trol diagnostics system is accessed for inspection, diagno-
 sis, service, or repair shall be standard and uniform on 
 all motor vehicles and motor vehicle engines;

 (B) that access to the emission control diagnostics sys-
 tem through such connectors shall be unrestricted and 
 shall not require any access code or any device which is 
 only available from a vehicle manufacturer; and

 (C) that the output of the data from the emission control 
 diagnostics system through such connectors shall be 
 usable without the need for any unique decoding infor-
 mation or device.

CAA s 202(m)(4), 42 U.S.C. s 7521(m)(4).

 Following the 1990 amendments, EPA promulgated an 
initial set of OBD regulations. It construed section 202(m)(4) 
to

__________
 5 S. Rep. No. 101-228, at 97, reprinted in 1990 U.S.C.C.A.N. at 
3482

 6 S. Rep. No. 101-228, at 98, reprinted in 1990 U.S.C.C.A.N. at 
3483.


 require[ ] that OBD system information be unrestricted 
 and accessible to anyone via standardized connectors 
 without requiring access codes or any device only avail-
 able from the manufacturer. Further, the OBD system 
 information must be usable without need for any unique 
 decoding information or device. To satisfy these man-
 dates, EPA [required] that OBD systems conform to 
 uniform industry standards ... and be accessible with 
 the use of a standard hand-held diagnostic tool.

Control of Air Pollution from New Motor Vehicles, 58 Fed. 
Reg. 9468, 9471-72 (1993) (to be codified at 40 C.F.R. pt. 86). 
These regulations, however, did not include the "final require-
ments under which information ... would be made available 
to the service and repair industry." Id. at 9468.

 In 1995, EPA promulgated a "Service Information Rule" 
implementing section 202(m)(5). See Control of Air Pollution 
from New Motor Vehicles, 60 Fed. Reg. 40,474 (1995) (codi-
fied at 40 C.F.R. pts. 9, 86). In that rule, EPA "require[d] 
vehicle manufacturers to provide to the service and repair 
industry information necessary to service on-board diagnostic 
(OBD) systems and to perform other emission-related diagno-
sis and repair." Id. at 40,474. EPA declined, however, to 
interpret the rule to require the dissemination of all OBD 
programming information. The agency concluded that under 
section 202(m)(5),

 [m]anufacturers are only required to provide information 
 in order for persons to service and repair vehicles. They 
 are not required to provide recalibration information that 
 is not needed to make emissions-related diagnosis and 
 repairs, even if such information may be useful for the 
 manufacture of aftermarket parts.

Id. at 40,479. EPA also concluded that "manufacturers 
should be allowed to develop and implement the systems 
which they believe are most secure, such as encryption sys-
tems." Id. at 40,493.

B. California's OBD Regulations

 California first required automobile manufacturers to in-
stall OBDs in new cars sold in the state in 1988--two years 


before Congress mandated the installation of OBDs in cars 
sold nationwide.7 It revised those regulations for use in 1994 
model year cars (the "OBD II" regulations). The state 
expects the OBD II devices to detect misfires and monitor 
catalyst efficiency, evaporative systems, exhaust gas recircu-
lation systems, fuel systems, oxygen sensors, secondary air 
systems, and electronic emission-related powertrain compo-
nents, among other things. See 15 Cal. Reg. L. Rep. 124, 126 
(1995).

 California has long been concerned that OBDs could easily 
be disabled, altered, or replaced with parts manufactured by 
independent parts manufacturers in the aftermarket, negat-
ing their ability to restrict automobile emissions. For exam-
ple, the state has evinced concern that the computer chips 
that control the OBDs could be replaced by "performance 
chips" that reset the operating parameters of the emissions 
controls imposed by the devices on automobile exhaust sys-
tems. See 56 Fed. Reg. at 48,276 (describing the effects of 
performance chips). In 1989 California's Air Resources 
Board ("CARB") staff reported that "[a]ftermarket 'perfor-
mance chips' ... usually alter the emission control system 
calibration and in many cases disable emission control equip-
ment." 8 The report recommended that anti-tampering fea-
tures be required for OBDs so that such chips could only be 
substituted with difficulty. Id. In 1992, CARB's staff reit-
erated its concern that "there are no straightforward means 
of regulating the use of" aftermarket chips, and accordingly 
explained that "the OBD II requires vehicle computer moni-
toring systems to be tamper-proof to help ensure that such 
chips cannot be used." Letter from CARB to William Reil-
ly, Administrator, EPA 4 (Sept. 15, 1992). The state there-

__________
 7 See S. Rep. No. 101-228 at 97, reprinted in 1990 U.S.C.C.A.N. 
2285, 3482.

 8 CARB, Revisions to Malfunction and Diagnostic System 
Requirements Applicable to 1994 and Later New California 
Passenger Cars, Light-Duty Trucks, and Medium-Duty Vehicles 
with Feedback Fuel Control Systems 21 (1989) (hereinafter 
"CARB Report").


fore required that "[c]omputer-coded engine operating pa-
rameters" not be alterable without "specialized tools and 
procedures." Cal. Code Regs. tit. 13, s 1968.1(d) (1993). 
California also required all "reprogrammable computer code 
system[s]" to "include proven write-protect features." Id. 
In addition, the state briefly insisted that manufacturers "in-
clude enhanced tamper protection strategies including data 
encryption using methods to ensure the encryption algor-
ithm, and write protect features requiring electronic access 
to an off-site computer maintained by the manufacturer" in 
their OBDs beginning with the 1999 model-year. Cal. Code 
Regs. tit. 13, s 1968.1(d) (1995). CARB recently deleted the 
off-site computer requirement from the state's regulations. 
CARB, Initial Statement of Reasons For Proposing Rule-
making 24-25 (1996).

 Consequently, as of September 25, 1997, California's re-
vised anti-tampering regulations read:

 Computer-coded engine operating parameters shall not 
 be changeable without the use of specialized tools and 
 procedures (e.g., soldered or potted computer compo-
 nents or sealed (or soldered) computer enclosures). Sub-
 ject to Executive Officer approval, manufacturers may 
 exempt from this requirement those product lines which 
 are unlikely to require protection. Criteria to be evalu-
 ated in making an exemption include, but are not limited 
 to, current availability of performance chips, high perfor-
 mance capability of the vehicle, and sales volume.

Cal. Code Regs. tit. 13, s 1968.1(d) (1997).

 While California amended its anti-tampering regulations, 
the state also sought a waiver of federal preemption for its 
OBD II regulations. On June 14, 1995, CARB requested the 
EPA Administrator to grant a waiver of preemption for 
California's regulations as they stood in 1995. After notice 
and comment, EPA concluded that California had complied 
with the relevant requirements of the Clean Air Act, and 
granted CARB's application for a waiver. See California 
State Motor Vehicle Pollution Control Standards, 61 Fed. 
Reg. 53,371 (1996). Petitioners sought review of the EPA 


Administrator's decision in this court, pursuant to section 
307(b)(2) of the Act. See CAA s 307(b), 42 U.S.C. 
s 7607(b)(2).

C. The Deemed-to-Comply Rule

 As part of the first federal OBD rule promulgated in 1993, 
EPA included its own anti-tampering regulations as well as a 
"deemed-to-comply" rule. See 58 Fed. Reg. at 9486. Under 
that rule, "[d]emonstration of compliance with California OBD 
II requirements [would] satisfy [EPA] requirements ... 
through the 1998 model year." Id. EPA explained that 
"[f]or the 1994 through 1998 model years, [it would] enforce 
OBD requirements against either the California OBD II 
requirements ... or the Federal OBD requirements." 58 
Fed. Reg. at 9476. A number of aftermarket organizations 
promptly filed suit challenging these provisions. See Special-
ty Equip. Market Ass'n v. Browner, No. 93-1277 (D.C. Cir. 
May 19, 1994). As a result of an agreement between the 
petitioners and EPA, however, both parties requested the 
court to issue an order declaring the anti-tampering provision 
of the final rule, and any reference to California's anti-
tampering regulations, to be "vacated and ... void ab initio." 
The court thereafter issued an order vacating the relevant 
provisions.

 Following the settlement, EPA promulgated a revised final 
rule in 1995. The agency explained at the time, however, that 
it was

 continuing to review its policy concerns regarding tam-
 pering. EPA may in the future determine that it is 
 appropriate to promulgate new regulations to address 
 these concerns. If the Agency determines that new 
 regulations are appropriate, EPA will at that time pub-
 lish a notice of proposed rulemaking addressing these 
 concerns.

Control of Air Pollution From New Motor Vehicles, 60 Fed. 
Reg. 15,242, 15,245 (1995) (codified at 40 C.F.R. part 86).9 

__________
 9 The agency had issued an earlier "notice of decision", which 
outlined the challenge to the agency's anti-tampering regulations, 
described the settlement, and announced that the federal anti-


EPA therefore provided that demonstration of compliance 
with the 1995 version of California OBD II requirements 
would satisfy the federal OBD requirements, "except that 
compliance with Title 13 California Code s 1968.1(d), pertain-
ing to tampering protection, is not required to satisfy the 
requirements of this section." Id. at 15,247. In response to 
adverse comments by petitioner Motor & Equipment Manu-
facturers Association (MEMA),10 however, EPA revised the 
1995 rule to remove the reference to compliance with Califor-
nia's most recent regulations. EPA also began a new rule-
making process to update its waiver of the California OBD II 
regulations, resulting in 1996 in another version of the 
deemed-to-comply rule. Control of Air Pollution From New 
Motor Vehicles, 61 Fed. Reg. 45,898 (1996).

 The 1996 rule now challenged by petitioners represents yet 
another effort by the agency to "promulgate[ ] appropriate 
revisions to federal OBD regulations [whereby] compliance 
with the recently revised [California] OBD II requirements 
will satisfy federal OBD." Id. at 45,898. The 1996 rule 
provides that:

 Demonstration of compliance with California OBD II 
 requirements ... shall satisfy the requirements of this 
 section through the 1998 model year except that compli-
 ance with Title 13 California Code s 1968.1(d), pertaining 
 to tampering protection, is not required to satisfy the 
 requirements of this section.

40 C.F.R. s 86.094-17(j) (1997). EPA explained: "[t]his final 
rulemaking allows manufacturers to comply with federal OBD 
requirements by optionally complying with the revised and 
recently adopted California OBD II regulations." 61 Fed. 
Reg. at 45,899. Petitioners appealed, again pursuant to sec-
tion 307(b) of the CAA. See CAA s 307(b)(2), 42 U.S.C. 
s 7607(b)(2).

__________
tampering regulations and deemed-to-comply rule had been de-
clared void, pending a new rulemaking by the agency. Notice of 
Court Decision, 59 Fed. Reg. 51,114 (1994).

 10 See Control of Air Pollution From New Motor Vehicles, 60 
Fed. Reg. 37,945, 37,945 (1995).


 II.

 Before reaching the merits of the petitions, we address 
several justiciability issues raised by EPA.

A. Standing

 First, EPA contends that petitioners lack standing to chal-
lenge the deemed-to-comply rule. Essentially, the agency 
focuses on causation and redressibility, maintaining that peti-
tioners lack standing because EPA eliminated the require-
ment that manufacturers install anti-tampering measures in 
1993. According to the agency, the challenged 1996 rule took 
no action either to permit or forbid the use of such anti-
tampering measures on automobiles. Further, EPA notes, it 
expressly stated in the rulemaking leading to the 1996 rule 
that, "[it] is taking no action ... that has any effect on 
manufacturers [sic] legal requirement or ability voluntarily to 
equip vehicles with tampering protection measures." 61 Fed. 
Reg. at 45,901. Regarding redressibility, neither a remand 
nor a reversal, EPA maintains, would affect the ability, legal 
or factual, of manufacturers to install anti-tampering mea-
sures on their vehicles.

 The Supreme Court articulated a three-part Article III 
standing test in Lujan v. Defenders of Wildlife, 504 U.S. 555, 
560 (1992). See also Steel Co. v. Citizens for a Better Env't, 
118 S. Ct. 1003, 1016-17 (1998). To have constitutional 
standing, a petitioner first must have suffered an "actual or 
imminent," as opposed to "conjectural or hypothetical," "inju-
ry in fact." Lujan, 504 U.S. at 560 (citations and internal 
quotations omitted). Second, the injury must be "fairly trace-
able to the challenged action of the defendant and not the 
result of the independent action of some third party not 
before the court." Id. at 560-61 (citations and internal 
quotations omitted). Third, it must be "likely" that the injury 
will be "redressed by a favorable decision." Id. at 561; see 
also Common Cause v. FEC, 108 F.3d 413, 416 (D.C. Cir. 
1997).

 Petitioners satisfy the first prong of the Lujan test, which 
requires a concrete and particularized invasion of a legally 


protected interest. See Lujan 504 U.S. at 560. They repre-
sent persons who manufacture, rebuild, or distribute parts 
that compete with the parts sold by original automobile 
manufacturers. "A competitor is adversely affected by and 
has a substantial interest in orders affecting the matter as to 
which he is a competitor." Seaboard & Western Airlines, 
Inc. v. Civil Aeronautics Bd., 181 F.2d 515, 518 (D.C. Cir. 
1949). Petitioners' aftermarket parts may be difficult to 
install in light of California's anti-tampering regulations as 
condoned by EPA. Difficult installation will presumably 
reduce the demand for petitioner's parts, while increasing the 
demand for parts made by the automobile manufacturers that 
installed the anti-tampering devices. Petitioners are thus 
"likely to be financially injured" by EPA's deemed-to-comply 
rule. FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 477 
(1940). "[W]hen a challenged agency action authorizes alleg-
edly illegal [activity] that will almost surely cause [a] petition-
er to lose business," that petitioner has standing to make a 
claim. El Paso Natural Gas Co. v. FERC, 50 F.3d 23, 27 
(D.C. Cir. 1995); see also Association of Data Processing 
Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 152-53 (1970). 
Hence, the only questions are whether petitioners meet the 
second and third prongs of the Lujan test, for Article III 
standing purposes, or are prudentially barred.

 The EPA contends that the injury suffered by petitioners 
was not caused by and cannot be remedied by the agency 
because it is attributable to the automobile manufacturers, a 
"third party not before the court." Lujan, 504 U.S. at 560. 
Yet petitioners' injury is fairly traceable to EPA's rulemak-
ing, satisfying the second prong of the Lujan test. See id. at 
560. EPA itself has acknowledged that its deemed-to-comply 
rule has resulted in an almost unanimous decision by major 
manufacturers to install OBDs that comply with California's 
regulations. In a "Dear Manufacturer" letter of November 7, 
1997, EPA observed that "only one major automobile manu-
facturer is selling vehicles certified specifically to the EPA 
OBD requirements rather than choosing the California OBD 
II option." Letter from Jane Armstrong, Director, EPA 
Vehicle Programs and Compliance Division 1 (Nov. 7, 1997). 


The deemed-to-comply rule has had such an effect because it 
creates a tremendous incentive for manufacturers to install 
OBDs that comply with California's regulations in all their 
cars. By doing so, they need only make one kind of each car 
they sell instead of two kinds, one of which would be for sale 
in states that follow California's OBD regulations, and the 
other for sale in states that follow federal OBD regulations. 
If the manufacturers were not permitted to use California's 
OBD II system in the automobiles they make for sale in the 
states governed by the federal OBD regulations, then fewer 
cars would be sold with the allegedly illegal California OBDs. 
There is therefore no doubt that "the unfettered choices made 
by independent actors have been ... made in such manner as 
to produce causation." Freedom Republicans, Inc. v. FEC, 
13 F.3d 412, 417 (D.C. Cir. 1994) (quoting Lujan, 504 U.S. at 
562 (internal quotation marks omitted)).

 Also unpersuasive is EPA's contention that petitioners' 
injury is not redressable by the court. See Steel Co., 118 
S. Ct. at 1017; Lujan, 504 U.S. at 561. Vacation of the 
deemed-to-comply rule could remedy their injury by requir-
ing EPA to undertake a new rulemaking with respect to the 
application of California's OBD II regulations to EPA's OBD 
program. In that new proceeding, petitioners could argue for 
the necessity of a stringent bar against any anti-tampering 
regulations. Cf. Reytblatt v. Nuclear Regulatory Comm'n, 
105 F.3d 715, 721 (D.C. Cir. 1997). Indeed, petitioners 
maintain in both appeals that California's policy is unlawful, 
and were this court to interpret the Clean Air Act to preclude 
automobile manufacturers from installing any anti-tampering 
mechanisms, petitioners' task before the agency would be 
considerably eased.

 In addition to Article III standing, petitioners have shown 
that there is no prudential reason to deny them their day in 
court. See National Credit Union Admin. v. First National 
Bank & Trust Co. ("NCUA"), 118 S. Ct. 927, 933 (1998). 
Under the Administrative Procedure Act, 5 U.S.C. s 702 
(1994), a petitioner can establish "prudential standing" by 
showing that its interests are "arguably within the zone of 
interests to be protected or regulated by the statute ... in 


question." Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 
396 (1987) (quoting Association of Data Processing Serv. 
Orgs., Inc., 397 U.S. at 153). Petitioners are "suitable chal-
lengers to enforce" the Clean Air Act provisions at issue, 
First Nat'l Bank & Trust Co. v. National Credit Union 
Admin., 988 F.2d 1272, 1276 (D.C. Cir. 1993), especially 
because this "test is not meant to be especially demanding." 
Clarke, 479 U.S. at 399. A would-be plaintiff is outside the 
statute's "zone of interests" only "if the plaintiff's interests 
are so marginally related to or inconsistent with the purposes 
implicit in the statute that it cannot reasonably be assumed 
that Congress intended to permit the suit." Id.; see also 
NCUA, 118 S. Ct. at 935-36. Petitioners contend that CAA 
subsections 202(m)(4) and (5), which guarantee all mechanics 
access to information contained in the OBDs, render unlawful 
the anti-tampering regulations promulgated by California. 
Their interests in rebuilding and manufacturing replacement 
parts for the OBDs and the emissions systems that the 
devices monitor are related to the interests of mechanics who 
must access the information contained in the OBDs to deter-
mine whether any parts need to be repaired or replaced. 
Petitioners' "interests are [thus] sufficiently congruent with 
those of the [mechanics] that [petitioners are] not 'more likely 
to frustrate than to further the statutory objectives.' " First 
Nat'l Bank & Trust, 988 F.2d at 1275 (quoting Clarke, 479 
U.S. at 397 n.12); see also Scheduled Airlines Traffic Offices, 
Inc. v. Department of Defense, 87 F.3d 1356, 1359 (D.C. Cir. 
1996).

B. Mootness 

 Somewhat more persuasive is EPA's contention that the 
1997 revision of California's OBDs regulations moot portions 
of petitioners' challenge to the waiver. California no longer 
requires manufacturers to "employ proven methods to deter 
unauthorized reprogramming which may include copyrighta-
ble executable routines or other methods." Cal. Code Regs. 
tit. 13, s 1968.1(d) (1995). The state also eliminated the 
prospective requirement that "[b]eginning with the 1999 
model year, manufacturers shall include enhanced tamper 
protection strategies including data encryption ... and write 


protect features requiring electronic access to an off-site 
computer maintained by the manufacturer." Id. However, 
California's regulations continue to require that "[c]omputer-
coded engine operating parameters shall not be changeable 
without the use of specialized tools and procedures (e.g., 
soldered or potted computer components or sealed (or sol-
dered) computer enclosures)." Cal. Code Regs. tit. 13, 
s 1968.1(d) (1997).

 Guided by MEMA I's instruction that the court must not 
"ignore the public record of the CARB's amendments" lest it 
"in effect be deciding a hypothetical question," we conclude 
that petitioners' challenges based on the assumption that 
California's regulations would require access to an off-site 
computer for maintenance beginning with 1999 model-year 
cars are moot. MEMA I, 627 F.2d at 1104 n.18. The 
elimination of that requirement constitutes "a fundamental 
change in the state of affairs" that has warranted resort by 
the court to the mootness doctrine in similar circumstances. 
Id.

 Further, intervenor CARB contends that petitioners' entire 
challenge to the deemed-to-comply rule has become moot as a 
result of the changes in the California's regulations. "An 
action is moot when nothing turns on its outcome." Schering 
Corp. v. Shalala, 995 F.2d 1103, 1105 (D.C. Cir. 1993). A 
dispute may be mooted when the allegedly illegal conduct at 
issue has been voluntarily discontinued if (1) there is no 
reasonable expectation that the conduct will recur and (2) 
"interim relief or events have completely and irrevocably 
eradicated the effects of the alleged violation." County of 
Los Angeles v. Davis, 440 U.S. 625, 631 (1979); see also Reeve 
Aleutian Airways, Inc. v. United States, 889 F.2d 1139, 1142-
43 (D.C. Cir. 1989). The burden of establishing mootness 
rests on the party that raises the issue. Reeve Aleutian 
Airways, Inc., 889 F.2d at 1143. It is a "heavy" burden. 
Davis, 440 U.S. at 631.

 We conclude that petitioners' challenge to the waiver rule is 
not entirely moot because two sources of alleged regulatory 
injury have not been addressed by the 1997 amendments. 
First, California's revised regulations still require "specialized 


tools and procedures" to access or change "computer coded 
engine operating parameters." Cal. Code Regs. tit. 13, 
s 1968.1(d). A challenge to a portion of a regulation that is 
unaffected by intervening amendments does not become moot 
by reason of those amendments. The "[a]mendment[s] do[ ] 
not, however, eliminate the "actual controversy" between the 
parties; [they] inform[ ] the decision." First Gibraltar FSB 
v. Morales, 42 F.3d 895, 898 (5th Cir. 1995). Petitioners 
contend that the "specialized tools and procedures" require-
ment violates section 202(m), and that compliance with that 
subsection is a prerequisite to any waiver approval. Were 
the court to agree, it would follow that the 1997 revisions to 
California's OBD II regulations did not eradicate the effects 
of EPA's unlawful waiver.

 Second, California has been certifying cars with OBD II 
systems since the 1994 model year. Until the 1997 revisions, 
each car sold with an OBD II system had to "employ proven 
methods to deter unauthorized reprogramming which may 
include copyrightable executable routines or other methods." 
Cal. Code Regs. tit. 13, s 1968.1(d) (1995). These cars contin-
ue to carry OBDs equipped with methods to deter repro-
gramming, notwithstanding repeal of the requirements. If, 
as petitioners contend, the Clean Air Act requires both 
California and EPA to implement regulations barring the 
installation of any anti-tampering mechanisms in their OBDs, 
then the state unlawfully required manufacturers to install 
copyrightable routines designed to deter reprogramming over 
four model years. Were the court to agree with petitioners, 
the question would be whether they are entitled to access the 
information shielded by the encryption devices required by 
the state for cars built in those years. Cf. Atlantic Richfield 
Co. v. United States, 774 F.2d 1193, 1198 (D.C. Cir. 1985).

 Furthermore, EPA's interpretation of section 209(b)--spe-
cifically that the waiver provision does not require compliance 
with section 202(m)--is likely to affect its evaluation of all 
California waivers. Because petitioners maintain that the 
waiver process requires compliance with section 202(m), they 
are "more broadly ... attacking the standards" that the EPA 
applies in its review of waiver requests. Defenders of Wild-


life, Inc. v. Endangered Species Scientific Auth., 659 F.2d 
168, 175 (D.C. Cir. 1981). These standards have not been 
affected by the 1997 revisions.

C. Timeliness

 EPA also contends that petitioners' challenges to its 
deemed-to-comply rule are untimely, and its argument is not 
without some force. Appeals from final decisions made under 
the Clean Air Act must be filed within sixty days of the date 
of the decision's publication in the Federal Register. See 
CAA s 307(b), 42 U.S.C. s 7607(b) (Supp. V 1993).11 This 
filing period is " 'jurisdictional in nature, and may not be 
enlarged or altered by the courts.' " Edison Elec. Inst. v. 
EPA, 996 F.2d 326, 331 (D.C. Cir. 1993) (quoting NRDC v. 
NRC, 666 F.2d 595, 602 (D.C. Cir. 1981)). This is not a case, 
however, where petitioners have barely missed a deadline. 
Rather, EPA contends that they should have challenged the 
agency's authority in two earlier rulemakings.

 The agency first contends that petitioners' challenge to its 
authority to require anti-tampering devices should have been 
made when the agency initially promulgated its 1993 OBD 
regulations, which included a version of the deemed-to-comply 
rule and an interpretation of section 202(m)(4). See 58 Fed. 
Reg. at 9470-71, 9487. However, EPA's prior efforts to 
promulgate a deemed-to-comply rule were unsuccessful. 
EPA abandoned its 1993 version of the deemed-to-comply 
rule when it agreed to vacate its 1993 rule and asked for an 
order declaring the rule "void ab initio." Thus, insofar as 
petitioners are concerned, it is as though the 1993 rule never 
existed. EPA's next effort was the 1995 final rule. But in 
dismissing their appeal of the 1993 rule, aftermarket petition-
ers expressly reserved their right to challenge the 1995 rule. 
Their adverse comments on that rule prompted EPA to 
promulgate the 1996 rule that is the subject of this appeal.

__________
 11 The statute also provides a sixty day period in which to file 
claims based on grounds arising after the initial sixty day period 
has expired. See CAA s 307(b), 42 U.S.C. 7607(b) (Supp. V 1993).


 As this chronology suggests, it would have been fruitless 
for petitioners to have appealed the 1995 rule at the very time 
that the agency was affirmatively responding to petitioners' 
comments. Had they filed such an appeal, the agency likely 
would have argued that it was not ripe or would have sought 
a remand or a stay in light of its then-present intention of 
modifying the rule in response to petitioners' comments. So 
viewed, it was not until EPA promulgated a revised final rule 
in 1996 that petitioners could have perfected an appeal, and 
they have done so.

 Furthermore, the subjects covered by California's regula-
tions, which EPA has deemed to comply with federal law, 
were revised between 1993, the first year that EPA promul-
gated an OBD regulation, and the deemed-to-comply rule-
making in the instant appeal. For example, California's 
earlier regulations required "reprogrammable computer code 
systems" to include "proven write-protect features which may 
include copyrightable executable routines or other methods." 
Cal. Code Regs. tit. 13, s 1968.1(d) (1993). By the time 
California applied for a waiver, however, the write-protect 
requirement had been deleted from its regulations. See Cal. 
Code Regs. tit. 13, s 1968.1(d) (1995). Its regulations have 
been revised further since 1995. Consequently, to some 
extent, the 1996 deemed-to-comply rule before the court is a 
different rule than the one promulgated in 1993, with differ-
ent state regulations at stake. Cf. Office of Communication 
of the United Church of Christ v. FCC, 911 F.2d 813, 815-16 
(D.C. Cir. 1990); Louisiana Envtl. Action Network v. Brown-
er, 87 F.3d 1379, 1385 (D.C. Cir. 1996). EPA acknowledged 
as much when it updated the waiver of preemption that it 
awarded California in 1996. See California State Motor Vehi-
cle Pollution Control Standards, 61 Fed. Reg. 53,371 (1996).

 Accordingly, we conclude that EPA's unsuccessful prior 
efforts to promulgate a deemed-to-comply rule concerning a 
substantially different set of California regulations do not 
render petitioners' challenge to this rule untimely.

 Second, EPA contends that petitioners should have chal-
lenged its discussion of section 202(m)(4) in the 1993 OBD 


rule. In that rule, the agency interpreted subsection (m)(4) 
to require OBD system information to be "unrestricted and 
accessible to anyone via standardized connectors without 
requiring access codes or any device only available from the 
manufacturer." 58 Fed. Reg. at 9471-72. EPA thus conclud-
ed that OBD systems had to "be accessible with the use of a 
standard hand-held diagnostic tool." Id. at 9472. EPA main-
tains that petitioners should have attempted to persuade it, at 
that point, to interpret subsection (m)(4) to preclude any 
regulation permitting manufacturers to install anti-tampering 
devices on their OBDs. Although the question is close, we 
conclude that this argument is also unconvincing. Any such 
challenge to the agency's interpretation of subsection (m)(4) 
regarding anti-tampering devices would not have been ripe 
for this court's review, since EPA agreed to an order declar-
ing its anti-tampering regulations void before a challenge 
could be made. See Specialty Equip. Market Ass'n v. 
Browner, No. 93-1277 (D.C. Cir. May 19, 1994). Petitioners 
are not expected to challenge an agency's interpretation that 
has not been implemented by any regulation. See US West, 
Inc. v. FCC, 778 F.2d 23, 27-28 (D.C. Cir. 1985). "A time 
limitation on petitions for judicial review ... can run only 
against challenges ripe for review." Baltimore Gas & Elec. 
Co. v. ICC, 672 F.2d 146, 149 (D.C. Cir. 1982). A challenge 
that would have been unripe if it had been brought earlier can 
hardly be characterized as untimely now.12

 Similarly, EPA's third contention, that petitioners should 
have pursued their challenges when the agency promulgated 
the Service Information Rule in 1995, which implemented 
section 202(m)(5) of the CAA by "requir[ing] vehicle manufac-
turers to provide to the service and repair industry informa-
tion necessary to service on-board diagnostic (OBD) systems 

__________
 12 EPA's discussion of section 202(m)(4) in its response to 
comments on the Service Information Rule was similarly ambigu-
ous. There, the agency intimated that it did not "believe" that 
section 202(m)(4) required "internal computer codes" or "repro-
gramming information" to be provided to independent technicians. 
But this "belief" hardly constituted the stuff of which petitioners 
could have sought review.


and to perform other emission-related diagnosis and repair," 
60 Fed. Reg. at 40474, is unpersuasive. As originally pro-
posed, the Service Information Rule included an anti-
tampering provision similar to California's. See 56 Fed. Reg. 
at 48,272, 48,276, 48,296. This provision was deleted following 
the stipulated court order vacating portions of the rule. 
EPA, however, continued to consider an anti-tampering policy 
and retained the discretion to promulgate new regulations in 
the future. See Control of Air Pollution from New Motor 
Vehicles, 60 Fed. Reg. 15,242, 15,245 (1991). But in the final 
version of the Service Information rule, "EPA ... decided 
not to require secured systems," based upon comments from 
petitioners and other interested parties. Thus, petitioners 
prevailed again. While the agency indicated that it "be-
lieve[d]" that manufacturers "should be allowed" to develop 
OBDs with encryption devices, 60 Fed. Reg. at 40,493, and 
also asserted that it had "authority" to require such devices in 
the future, such dicta could hardly be characterized as a 
portion of EPA's final rule. EPA did not promulgate an anti-
tampering regulation. Had petitioners sued over the dicta 
then, their lawsuit would have been dismissed as unripe. See 
US West, Inc., 778 F.2d at 27-28. "[T]he calendar does not 
run until the agency has decided a question in a manner that 
reasonably puts aggrieved parties on notice of the rule's 
content." RCA Global Communications, Inc. v. FCC, 758 
F.2d 722, 730-31 (D.C. Cir. 1985). Petitioners cannot reason-
ably be expected to have speculated then that this discussion 
of encryption meant that EPA would later interpret Califor-
nia's anti-tampering devices not to violate the Clean Air Act. 
As petitioners maintain, the issue of the agency's authority 
was not joined in the Service Information rulemaking itself 
because neither the proposed rule nor the terms of the final 
rule addressed what EPA might permit "voluntarily" in the 
future.

 Undoubtedly, petitioners might have challenged the agen-
cy's authority from the beginning, as EPA suggests, but as 
the evolution of the 1996 deemed-to-comply rule demon-
strates, there would have been no occasion to address their 
contentions until the instant appeal. The agency, confronted 


with a challenge to its authority, modified its proposed rule in 
response to petitioners' substantive concerns and thereby 
postponed confronting the issue of its authority.

D. Exhaustion

 We agree, however, that one of petitioners' contentions is 
not properly before the court. Petitioners contend that the 
deemed-to-comply rule "nationalizes" the "California car" be-
cause it changes the emissions standards that Congress set 
for the remaining forty-nine states. CAA section 202(b)(1)(C) 
provides that "[i]t is the intent of Congress that the numerical 
emission standards specified in" the Act "shall not be modi-
fied by the Administrator after November 15, 1990, for any 
model year before the model year 2004." CAA 
s 202(b)(1)(C), 42 U.S.C. s 7521(b)(1)(C). California's emis-
sions standards are lower than those in the CAA. Compare 
Cal. Code Regs. tit. 13, s 1960.1(f) & (g) (1997) with CAA 
202(g), 42 U.S.C. s 7521(g). Consequently, if the EPA rule 
had the effect that manufacturers nationalized their Califor-
nia cars, petitioners contend, then the rule would change the 
emissions standards provided by Congress in contravention of 
the Act.

 The CAA provides that "only an objection to a rule or 
procedure which was raised with reasonable specificity during 
the period for public comment ... may be raised during 
judicial review." CAA s 307(d)(7)(B), 42 U.S.C. 
s 7607(d)(7)(B) (1988). The court enforces this provision 
"strictly," NRDC v. Thomas, 805 F.2d 410, 427 (D.C. Cir. 
1986), to ensure that EPA has an opportunity to respond to 
every challenge to the regulatory regime it administers. 
Consequently, the court enjoys the benefit of the agency's 
expertise and possibly avoids addressing some of the chal-
lenges unnecessarily. Petitioners did not cite section 
202(b)(1)(C) in their comments to the agency. Although they 
argued that California had to act consistently "with CAA 
section 202," that section covers a number of areas, including 
national standards for emissions of carbon monoxide, hydro-
carbons, and nitrogen oxides, see CAA s 202(g), 42 U.S.C. 
s 7521(g), cold start emissions standards, see CAA s 202(j), 


42 U.S.C. s 7521(j), and provisions for a study of unregulated 
toxic air pollutants, see CAA s 202(l), 42 U.S.C. s 7521(l). 
Thus, petitioners' objection, based on a bare reference to 
section 202, can only fairly be characterized as unspecific. Cf. 
American Petroleum Inst. v. EPA, 52 F.3d 1113, 1119 (D.C. 
Cir. 1995). While petitioners also argued that a "single on-
board diagnostic system can be used nationally [but] it should 
be a system which meets the current federal requirements as 
mandated by Congress," the current federal requirements 
mandated by Congress cover the entire Clean Air Act. EPA 
could not reasonably evaluate petitioners' intricate section 
202(b)(1)(C) argument in light of their vague reference to 
"federal requirements." Both prudence and judicial economy 
dictate that we reject petitioners' efforts here. Having failed 
in their generalities about federal standards to give the 
agency an opportunity to consider their specific concerns, 
petitioners cannot raise them for the first time now.

 III.

 Turning to the merits, petitioners contend that California's 
anti-tampering provisions are illegal under s 202(m)(4) and 
(m)(5), and therefore EPA should not have granted the state 
a waiver. Additionally, petitioners maintain that EPA cannot 
itself adopt a deemed-to-comply rule that would allow manu-
facturers to meet federal standards while employing anti-
tampering technology. They contend that subsections (m)(4) 
and (m)(5) taken both separately and in tandem affirmatively 
require unrestricted access to the OBDs. We conclude that 
EPA is not required to consider the mandates of subsections 
(m)(4) and (m)(5) in granting a waiver, and, in any event, 
nothing in either section prohibits California from adopting 
anti-tampering provisions. Thus, neither the waiver nor the 
deemed-to-comply rule were contrary to law.

A. Section 202(m) and the Waiver Requirement

 Petitioners make a textual argument, relying on internal 
cross-references within section 202 in an effort to show that 
subsection (m)'s information and access requirements must be 


factored into the agency's determination whether to grant 
California's waiver application. There are several problems 
with their approach.

 First, section 209(b) sets forth the only waiver standards 
with which California must comply. California must conclude 
that its standards "will be, in the aggregate, at least as 
protective of public health and welfare as applicable Federal 
standards" to obtain a waiver. CAA s 209(b)(1), 42 U.S.C. 
s 7543(b)(1). EPA then must conclude that the state's stan-
dards were not promulgated in an arbitrary and capricious 
fashion, that the state needs its standards "to meet compel-
ling and extraordinary conditions," and that the state's stan-
dards are consistent with section 202(a). See id. If EPA 
concludes that California's standards pass this test, it is 
obligated to approve California's waiver application. The test 
makes no reference to section 202(m).

 Petitioners do not contend that California's OBD II regula-
tions directly violated section 202(a), which establishes the 
general authority of the EPA Administrator to prescribe 
federal emissions standards by regulation. See CAA 
s 202(a), 42 U.S.C. s 7521(a). In the waiver context, section 
202(a) "relates in relevant part to technological feasibility and 
to federal certification requirements." Ford Motor Co. v. 
EPA, 606 F.2d 1293, 1296 n.17 (D.C. Cir. 1979); see also 
MEMA I, 627 F.2d at 1101, 1111. The "technological feasibil-
ity" component of section 202(a) obligates California to allow 
sufficient lead time to permit manufacturers to develop and 
apply the necessary technology.13 See American Motors 
Corp. v. Blum, 603 F.2d 978, 981 (D.C. Cir. 1979). The 
federal certification component ensures that the Federal and 
California test procedures do not "impose inconsistent certifi-
cation requirements." Waiver of Federal Preemption, 46 

__________
 13 EPA has explained that it must deny a waiver for California 
if the state's regulations provide "inadequate lead time to permit 
the development of the technology necessary to implement the new 
procedures, giving appropriate consideration to the cost of compli-
ance within the time frame." Waiver of Federal Preemption, 46 
Fed. Reg. 26,371, 26,372 (1981).


Fed. Reg. 26,371, 26,372 (1981). Neither the court nor the 
agency has ever interpreted compliance with section 202(a) to 
require more. See, e.g., MEMA I, 627 F.2d at 1101, 1111; 
Ford Motor Co., 606 F.2d at 1296 n.17; American Motors 
Corp., 603 F.2d at 981; Waiver of Federal Preemption, 46 
Fed. Reg. at 26372.

 Second, the agency's long-standing interpretation and the 
legislative history run counter to petitioners' contention that 
to obtain a waiver California must also comply with section 
202(m) because sections 202(a) and 202(m) cross-reference 
each other. Under subsection (a), the EPA Administrator is 
required to prescribe and revise regulations "in accordance 
with the provisions of this section," including, in petitioners' 
view, subsection (m). Id. s 7521(a)(1). Subsection (m) simi-
larly provides that the agency must "promulgate regulations 
under subsection (a) of this section" implementing Congress' 
OBD provisions. Id. s 7521(m)(1). Although statutory 
cross-referencing presents a superficially plausible textual 
argument linking compliance with subsection (m) to compli-
ance with subsection (a), the agency has long interpreted the 
statute to give California very broad authority, and the court 
has held that this interpretation is not unreasonable. Cf. 
Ford Motor Co., 606 F.2d at 1297 (observing that Congress 
had permitted California to adopt different specific emissions 
requirements than those provided in the CAA). It is also 
contrary to the legislative history of the waiver provision 
emphasizing that California is to have the "broadest possible 
discretion in selecting the best means to protect the health of 
its citizens." H.R. Rep. No. 95-294, at 301-02, quoted in 
MEMA I, 627 F.2d at 1110. As the provisions of section 
209(b) make clear, Congress has also provided that EPA "is 
not to overturn California's judgment lightly." H.R. Rep. No. 
95-294, at 302, quoted in MEMA I, 627 F.2d at 1123 n.54. 
"In short, Congress consciously chose to permit California to 
blaze its own trail with a minimum of federal oversight." 
Ford Motor Co., 606 F.2d at 1297; see also Engine Mfrs. 
Ass'n, 88 F.3d at 1080.

 The agency's longstanding interpretation that section 
209(b) does not require California to establish perfect compli-


ance with the CAA to obtain a waiver is particularly plausible 
because section 209(b) explicitly requires on that the state's 
standards "be, in the aggregate, at least as protective of 
public health and welfare as applicable Federal standards." 
CAA s 209(b)(1), 42 U.S.C. s 7543(b)(1). Petitioners make 
no claim that California's OBD standards do not satisfy this 
requirement. They instead limit their arguments under sec-
tion 209(b) to whether California's standards are consistent 
with section 202(a). But section 209(b)(1) makes clear that 
section 202(a) does not require, through its cross-referencing, 
consistency with each federal requirement in the act. Cali-
fornia's consistency is to be evaluated "in the aggregate," 
rather than on a one-to-one basis. CAA s 209(b)(1), 42 
U.S.C. s 7543(b)(1).

 Third, it would appear virtually impossible for California to 
exercise broad discretion if it had to comply with every 
subsection of section 202 that cross-referenced subsection (a). 
See, e.g., CAA s 202(b), (g), (h), (j), (m)(1), (m)(2), (m)(4), 42 
U.S.C. s 7521(b), (g), (h), (j), (m)(1), (m)(2), (m)(4). For 
example, under CAA s 202(g), 42 U.S.C. s 7521(g), EPA has 
observed, "California would not be denied a waiver if its CO 
standard were slightly higher than the federal ... stan-
dard.... This is despite the fact that section 202(g) contains 
specific standards for CO that EPA must promulgate." EPA 
Air Docket A-90-28, Doc. No. V-B-1 at 47. Requiring 
California to meet the standards of each subsection of section 
202 would eviscerate much of the flexibility of the waiver 
program, in contravention of Congress' purpose in creating it, 
as EPA's traditional interpretation and decisions by this court 
have recognized. Congress created the waiver provision so 
that "California could enforce emission control standards 
which it determined to be in its own best interest even if 
those standards were in some respects less stringent than 
comparable federal ones." Ford Motor Co., 606 F.2d at 1301.

 It is true that, in addition to the lead-time and technological 
feasibility requirements set forth in section 202(a), California 
must not arbitrarily and capriciously conclude that its stan-
dards are "at least as protective of health and welfare as 
applicable Federal standards." CAA s 209(b)(1), (2), 42 


U.S.C. s 7542(b)(1), (2). Conceivably this requirement could 
lead the EPA to examine the state's application in light of 
section 202(m) in addition to the other substantive require-
ments of the Clean Air Act. But the state is not required to 
establish a one-to-one correspondence with the federal stan-
dards set forth in section 202(m) to obtain its waiver.14 See 
Ford Motor Co., 606 F.2d at 1297.

B. Section 202(m) Compliance

 Nevertheless, we must consider whether California's OBD 
II regulations comply with section 202(m) for two reasons. 
First, in recognition of the serious consequences that would 
follow if California's regulations did not comply with section 
202(m), the agency considered whether California's OBD II 
standards met the section's requirements in evaluating its 
waiver application. See EPA Air Docket A-90-28, No. 
V-B-1. EPA did so because

 section 202(m)(4) and (5) were [sic] designed to allow 
 the aftermarket to receive information that Congress 
 believed was necessary for aftermarket repair and diag-
 nosis. If California's regulations are, as aftermarket 
 commentators suggest, clearly contrary to the intent of 
 Congress, then EPA's granting of a waiver to California 
 would effectively eliminate this key Congressional provi-
 sion in California (and any other state that enacts Cali-

__________
 14 Petitioners' reliance on American Motors Corp., 603 F.2d at 
981, is misplaced. In that case, EPA viewed the petitioner's 
complaint about the lead time for a proposed action by CARB to be 
solely based on section 202(b), not section 202(a), and so was not 
cognizable in the waiver process. The court disagreed, observing 
that the lead time for implementation of the NOx standard was 
governed by section 202(a)(2) and concluding that "the California 
regulation, which denies to [petitioner] a lead time of two years, is 
inconsistent with" section 202(a)(2). Id. at 981. Thus, the Ameri-
can Motors decision did not suggest that all of the subsections of 
section 202 were incorporated into subsection (a) for the purposes of 
assessing a California waiver application. Instead, it concluded that 
the EPA had granted a waiver without determining whether Cali-
fornia had met the standards of section 202(a).


 fornia's regulations through section 177). Given the 
 substantial implications of this, EPA must tread careful-
 ly.

Id. at 47. Second, EPA was obligated to determine whether 
California's OBD II regulations complied with section 202(m) 
when it promulgated its deemed-to-comply rule. By making 
those regulations a federal option, the agency was required to 
evaluate whether they met the statutory requirements for 
federal regulations. Hence, the court is not confronted with a 
situation in which, by means of the California waiver and 
section 177's provision allowing other states to opt into the 
California system, the protections provided by subsections 
(m)(4) and (5) would be eliminated by widespread adoption of 
California's rules. See CAA s 177(1), 42 U.S.C. s 7507(1).

 Petitioners contend that California's OBD II regulations 
violate section 202(m)(5)'s requirement that automobile manu-
facturers must make available "any and all information need-
ed to make use of the emission control diagnostics system." 
CAA 202(m)(5), 42 U.S.C. s 7521(m)(5). They maintain that 
subsection (m)(5) requires California and EPA to adopt regu-
lations that divulge all the information contained on OBD 
chips, perhaps because doing so would ease the task of their 
members, who manufacture replacement parts, to make their 
own versions of the chips and compatible OBD components. 
But as subsection (m)(5) makes clear, only "person[s] engaged 
in the repairing or servicing of motor vehicles or motor 
vehicle engines" are entitled to "information needed to make 
use of the" OBDs. CAA s 202(m)(5), 42 U.S.C. s 7521(m)(5). 
The plain language of the statute therefore establishes that 
subsection (m)(5) does not entitle aftermarket manufacturers 
to the information needed to make replacement OBD parts. 
EPA has accordingly concluded that the term "information 
needed" refers to information that mechanics can use to 
repair automobiles, and that the availability of such informa-
tion is not precluded by California's anti-tampering regula-
tions. EPA explained that "[s]ection 202(m)(5) is designed 
solely to make sure that manufacturers provide aftermarket 
repair personnel with the same emission-related repair and 
diagnostic information that they provide to their dealers.... 


Availability of such information is not prevented by Califor-
nia's anti-tampering provisions." EPA Air Docket A-90-28, 
No. V-B-1 at 61 (emphasis in original).

 Although the plain language of section 202(m)(5) does not 
make clear exactly what information independent mechanics 
do need to service OBDs, it is possible to interpret subsection 
(m)(5) to require access to all the information about OBDs 
that is otherwise hidden by anti-tampering devices, as peti-
tioners urge. CAA s 202(m)(5), 42 U.S.C. s 7521(m)(5). To 
the extent that the precise contours of the type of information 
about OBDs that automobile manufacturers are required to 
turn over to independent service providers under subsection 
202(m)(5) is not set forth, the statute is ambiguous. Because 
of this ambiguity, we evaluate EPA's interpretation limiting 
the amount of information available to service providers in 
light of the second step of the familiar Chevron analysis, 
which requires the court to defer to the agency's reasonable 
interpretation of the CAA. See Chevron U.S.A., Inc. v. 
NRDC, 467 U.S. 837, 842-43 (1984).

 We conclude that EPA's interpretation of subsection (m)(5) 
reasonably comports not only with the statute's discussion of 
"information needed," but also with its protection of the trade 
secrets of automobile manufacturers. Easy access to the 
computer programs underlying the OBDs and protected by 
anti-tampering devices would make protection of the intellec-
tual property contained therein difficult, without making the 
servicing of vehicles containing OBDs any easier. See 60 
Fed. Reg. at 40,492. Congress sought to balance the need of 
all mechanics for information from the devices, thereby pre-
serving competition with service and repair shops unaffiliated 
with manufacturers, with the right of those manufacturers to 
protect their trade secrets, promoting further innovation in 
OBD technology. See, e.g., 136 Cong. Rec. 5391-92 (1990) 
(Statements of Sens. Baucus, Chafee, and Gore). Subsection 
(m)(5) therefore requires manufacturers to turn over service 
information, but not trade secrets, to independent mechanics. 
See CAA s 202(m)(5), 42 U.S.C. s 7521(m)(5). EPA was 
consequently obligated to strike such a balance in implement-
ing the subsection, and there is no record evidence that the 


chip protections and write-protect encryption adopted in Cali-
fornia's OBD II regulations prevent mechanics from obtaining 
the information they need from the devices to make repairs.15 
Under such circumstances we defer to EPA's conclusion that 
California's regulations maintain, rather than upset, that bal-
ance.

 Petitioners' contentions regarding section 202(m)(4) are 
also unpersuasive. That subsection requires, among other 
things, that "access to the emission control diagnostics sys-
tem" be "unrestricted and shall not require any access code" 
and that "the output of the data from the emission control 
diagnostics system be usable without the need for any unique 
decoding information or device." CAA s 202(m)(4)(B-C); 42 
U.S.C. s 7521(m)(4)(B-C). Petitioners contend that the sub-
section affirmatively requires unrestricted access to all of the 
information contained in OBDs. But the statute only re-
quires easy access to the OBDs for the purposes of "inspec-
tion, diagnosis, service, or repair." CAA s 202(m)(4)(A), 42 
U.S.C. s 7521(m)(4)(A). As EPA explained, "the intent of 
section 202(m)(4) is that the information received by the 
emission control diagnostics portion of the OBD system con-
cerning emission-related deterioration and malfunction be 
readily available to independent technicians.... [S]ection 
202(m)(4) was not intended to require proprietary informa-
tion, like internal computer codes, to be subject to unlimited 
access through the standard data connecters." EPA Air 
Docket A-90-28, No. V-B-1 at 61. While the soldering or 
potting of chips contemplated by the California regulations 
may make the chips difficult to extract and copy or repro-
gram, petitioners have presented no evidence that they pre-
vent the faults identified by the OBDs from being accessed by 
a mechanic. As EPA explained in its waiver determination, 

__________
 15 EPA reports that it "has received no information [indicating] 
that this information is needed by repair personnel to repair 
vehicles.... [T]here have been many comments indicating that 
service people have no use for such underlying information and 
would likely not know how to use it if they had access to it." 60 
Fed. Reg. at 40,492.


"California's requirement for potting computers ... [has] 
little to do with the 'access to the emission control diagnostics 
system' that is protected by section 202(m)(4)(B)." Id. To 
the extent that the subsection's guarantees include ambiguous 
terms such as "access" and "usable" "output," we defer to the 
agency's reasonable interpretation of those terms. See Chev-
ron, 467 U.S. at 842-43.

 IV.

 Petitioners further contend that section 207's warranty 
provisions invalidate California's anti-tampering regulations. 
Section 207 requires all "manufacturer[s] of each new motor 
vehicle and new motor vehicle engine [to] warrant to the 
ultimate purchaser and each subsequent purchaser" of an 
automobile that the automobile complies with section 202 of 
the Act. CAA s 207(a)(1), 42 U.S.C. s 7541(a)(1) (1988). 
Congress has taken steps to prevent manufacturers from 
creating parts and service monopolies through their emissions 
warranty programs. Pursuant to section 207(b), "if a vehicle 
owner [has] installed a certified aftermarket part, the vehicle 
manufacturer" cannot "refuse to honor the owner's warranty 
repair claim." 16 Automotive Parts Rebuilders Ass'n v. EPA, 
720 F.2d 142, 158 (D.C. Cir. 1983). Similarly, under section 
207(c), a manufacturer may not condition its warranty on 
service by a mechanic affiliated with the manufacturer.17 See 
id. at 159 n.68. Petitioners contend that California's anti-

__________
 16 Section 207(b) provides that the manufacturer may not invali-
date any warranty "on the basis of any part used in the mainte-
nance or repair of a vehicle or engine." See CAA s 207(b)(2), 42 
U.S.C. s 7541(b)(2).

 17 Section 207(c) provides that a manufacturer generally may 
not condition its warranty on a requirement that the automobile be 
serviced "by the franchised dealers of such manufacturer or any 
other service establishments with which such manufacturer has a 
commercial relationship" as opposed to "service performed by inde-
pendent automotive repair facilities with which such manufacturer 
has no commercial relationship." CAA s 207(c)(3)(B), 42 U.S.C. 
s 7541(c)(3)(B).


tampering provisions contradict these protections by effec-
tively preventing the use of aftermarket replacement chips.

 Petitioners appear, however, to misperceive the legal link 
between section 207 and section 209, which sets forth the 
standards that EPA must apply to California's waiver applica-
tions. Although EPA "must be sensitive to the anti- 
competitive concerns Congress expressed in" section 207, it 
"has no obligation under section 209(b) to guarantee that 
California's regulations are without anticompetitive implica-
tions." MEMA v. EPA (MEMA II), 627 F.2d 1128, 1131 
(D.C. Cir. 1979). California is not required to comply with 
section 207 to obtain a waiver, see CAA s 209(b), 42 U.S.C. 
s 7543(b), and, as noted, the agency may not evaluate Califor-
nia's waiver application "based on factors other than those 
Congress expressly or impliedly intended the agency to con-
sider." MEMA I, 627 F.2d at 1116.

 V.

 Finally, petitioners contend that EPA failed to comply with 
two statutory provisions requiring the analysis of the effects 
of a proposed rule on certain small entities such as busi-
nesses.

 On neither can petitioners prevail. First, petitioners con-
tend that EPA failed to comply with the Regulatory Flexibili-
ty Act ("RFA"), 5 U.S.C. ss 601-12 (1988), when it promul-
gated its deemed-to-comply rule. The RFA requires that an 
agency conduct a regulatory flexibility analysis for any rule 
that will have a "significant economic impact on a substantial 
number of small entities." Id. s 605(b). "[I]n an appropri-
ate case, [a court may] strike down a rule because of a defect 
in the flexibility analysis." Small Refiner Lead Phase-Down 
Task Force v. EPA, 705 F.2d 506, 538 (D.C. Cir. 1983). This 
is not an appropriate case. There is nothing to indicate any 
defect in EPA's compliance with the statute.

 EPA concluded when it promulgated its final rule that, 
"[t]his rule will not have a significant adverse economic 
impact on a substantial number of small businesses" and, 


therefore, did not conduct a regulatory flexibility analysis on 
those entities. 61 Fed. Reg. at 45,902. The RFA does not 
contemplate an analysis in such situations. See 5 U.S.C. 
s 605(b). While EPA only considered whether its deemed-to-
comply rule would have "a substantial impact" on "large and 
small volume automobile manufacturers," id., it was not 
obliged to conduct a regulatory flexibility analysis for any 
other business, including the businesses represented by peti-
tioners. An agency is under "no obligation to conduct a small 
entity impact analysis of effects on entities which it does not 
regulate." 18 United Distribution Cos. v. FERC, 88 F.3d 
1105, 1170 (D.C. Cir. 1996); see also Mid-Tex Elec. Co-op, 
Inc. v. FERC, 773 F.2d 327, 342 (D.C. Cir. 1985). Because 
the deemed-to-comply rule did not subject any aftermarket 
businesses to regulation, EPA was not required to conduct a 
flexibility analysis as to small aftermarket businesses. It was 
only obliged to consider the impact of the rule on small 
automobile manufacturers subject to the rule, and it met that 
obligation.

 Second, petitioners contend that EPA failed to comply with 
section 317(c)(3) of the Clean Air Act, which requires the 
agency to conduct an analysis of "the effects on competition of 
the standard or regulation with respect to small business." 
CAA s 317(c)(3), 42 U.S.C. s 7617(c)(3) (1988). Section 317 
also provides, however, that "[n]othing in this section shall be 
construed ... to authorize or require any judicial review of 
any such standard or regulation, or any stay or injunction of 
the proposal, promulgation, or effectiveness of such standard 
or regulation on the basis of failure to comply with this 
section." CAA s 317(e)(3), 42 U.S.C. s 7617(e)(3); see also 
MEMA I, 627 F.2d at 1116. Therefore, the court is without 

__________
 18 The RFA itself distinguishes between small entities subject 
to an agency rule, to which its requirements apply, and those not 
subject to the rule, to which the requirements do not apply. For 
example, the RFA only requires that the initial analysis contain 
information on "small entities to which the proposed rule will apply" 
and "small entities which will be subject to the requirement" of the 
rule in question. 5 U.S.C. s 603(b).


jurisdiction to evaluate petitioners' section 317(c)(3) conten-
tion.

 Accordingly, we dismiss so much of the petitions as are 
moot as a result of the 1997 revisions to California's regula-
tions and as are not properly before the court, and we deny 
the remaining portions of the petitions.